758 A.2d 574

Philip E. BERRINGER

v.

Nevett STEELE, Jr. et al.

No. 824, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Aug. 31, 2000.

444

Nathaniel E. Jones, Jr. (James H. Fields and Jones & Associates, P.C., on the brief), Baltimore, for appellant.

Alvin I. Frederick (James E. Dickerman and Eccleston and Wolf, on the brief), Baltimore, for appellees.

Argued before WENNER, HOLLANDER, and SONNER, JJ.

HOLLANDER, Judge.

In this legal malpractice case, we must determine whether the Circuit Court for Baltimore County erred in granting summary judgment to Nevett Steele, Jr., Esquire, Michael J. Gentile, Esquire, and the Law Firm of Nevett Steele, Jr., P.A. (the "Firm"), appellees, in connection with their post-trial representation of Philip E. Berringer, appellant, who had been convicted of theft and misappropriation of funds by a fiduciary. Berringer presents two general questions for our consideration, which we have rephrased slightly:

 I. Did the circuit court err in awarding summary judgment?

II. Did the circuit court abuse its discretion in denying appellant's post-trial motion to alter or amend judgment?

Appellant also raises four issues, which we have rephrased, reordered, and condensed as follows: [1]

I. Did appellant's failure to obtain post conviction relief bar his legal malpractice claim against appellees?

II. Did the circuit court correctly interpret appellant's complaint in determining that he knew appellees did not intend to file a notice of appeal on appellant's behalf and conclude that such knowledge barred recovery?

III. In its memorandum and ruling awarding summary judgment, did the circuit court ignore appellant's allegations of appellees' negligence and breach of contract with respect to their representation of appellant at sentencing?

## FACTUAL BACKGROUND[2]

Appellant filed his legal malpractice suit on January 30, 1998, after years of litigation arising from his involvement

---

1. The issues are set forth in appellant's brief as follows:
 A. The Trial Court's Opinion Completely Ignores Berringer's Allegations, Supported by Record Evidence, of the Defendants' Negligence and Breach of Contract With Regard to Sentencing.
 B. The Court's Grant of Summary Judgment on the Issue of the Defendants' Failure to File a Notice of Appeal on Berringer's Behalf is Based Upon a Demonstrably Incorrect Reading of the Complaint by the Court.
 C. There is No Requirement Under Maryland Law that Berringer Demonstrate That He Has Obtained Post–Conviction Relief Against These Defendants Prior to Filing This Legal Malpractice Lawsuit.
 D. Berringer's Petition for Post Conviction Relief Assessed Only Whether the Assistance Provided by Counsel Was Constitutionally Ineffective and Did Not, and Could Not, Address Whether A Party Had Demonstrated An Adequate Basis for a New Trial or For Appeal.

2. The facts are derived principally from appellant's complaint and the exhibits attached thereto. Where disputed, the facts have been construed in favor of appellant.

with the National Computer Ribbon Corporation ("NCRC"), a small manufacturing firm. From April 1986 to June 1993, Berringer was the president, chief executive officer, and a director of NCRC.

In November 1991, Joanne Hardy resigned her position as NCRC's production manager. Shortly thereafter, Berringer indefinitely suspended William Hardy, Joanne's husband, who was an NCRC salesman, director, and shareholder, pending an investigation into the allegedly unauthorized removal of files and documents from NCRC. Mr. Hardy and another director, Frank Schmidt, asserted that the file and document removal were part of their investigation of fraud and embezzlement purportedly committed by Berringer. In January 1992, Berringer terminated Mr. Hardy for alleged conversion of a company automobile.

On May 1, 1992, the Hardys initiated a wrongful termination suit against NCRC, Berringer, and Maria Staab. Staab was a member of the NCRC board, the company's office manager, and its corporate secretary. The Hardys claimed that Mr. Hardy had been terminated, and Ms. Hardy constructively terminated, because they chose to "blow the whistle" on Berringer's fraudulent procurement of over $200,000 in NCRC funds through a company called E & L Enterprises ("E & L"). After a three-week trial, the jury rendered a verdict against Berringer and NCRC for nearly $3 million, including $650,000 in punitive damages against appellant.

In October 1993, Berringer was charged in Baltimore County with fraudulent misappropriation by a fiduciary and felony theft. The case was tried to a jury in the circuit court (Howe, J., presiding) beginning on December 12, 1994. At trial, appellant was represented by Stewart Lyons, Esquire, an Assistant Public Defender.

The evidence presented at Berringer's criminal trial [3] revealed that NCRC used various subcontractors to perform

---

[3]. The record before us does not include transcripts from the criminal case, although excerpts have been provided.

some of its assembly and processing work. Over a period of time, NCRC paid out more than $227,000 to E & L based on invoices submitted for subcontracting work allegedly performed for NCRC. The evidence showed, however, that E & L had not performed the services, and that Berringer, who was affiliated with E & L, took the money paid on the invoices and deposited it into his personal bank account. Berringer maintained that he and his associates had performed the work reflected on the invoices at night and on the weekends, when the regular NCRC staff was not present. The jury convicted appellant of both charges. The court then denied Berringer's request for bail, and he was detained at the Baltimore County Detention Center pending sentencing.

On December 28, 1994, Berringer, through Lyons, moved for a new trial, proffering the following "reasons":

1. That juror number three, Denise Shipowick, disliked co-defendant Maria Staab.[4]

2. That Maria Staab and Mrs. Shipowick live in the same neighborhood. A couple of years ago, Mrs. Shipowick's son assaulted and battered Mrs. Staab's son. The Staabs insisted that [Mrs.] Shipowick's son be charged in juvenile court. Both Maria Staab and her husband Bernie Staab were in juvenile court for Mrs. Shipowick's son's case.

3. That both Maria Staab and her husband Bernie Staab believe that Mrs. Shipowick holds a feeling of animosity to them, and that Mrs. Shipowick would have recognized Maria Staab's name when the names of the potential witnesses were read during voir dire.

4. That one of the grounds for a new trial is the bias and disqualification of jurors. [Citation omitted.]

---

4. There is no other indication in the record that Staab was indicted and tried with Berringer. In fact, cover pages included with excerpts from the transcripts of appellant's criminal trial reveal a caption of "State of Maryland v. Phillip E. Berringer," and only one case number. In addition, only one attorney is identified as counsel "For the Defendant."

5. That, as a second ground, the defense presented uncontradicted evidence that the Defendant was owed or entitled to much more money than he allegedly stole from the corporation. In light of this, the jury's verdict was clearly against the weight of the evidence. [Citation omitted.]

6. And for such other and further reasons as may be assigned at a hearing on this motion.

A hearing on that motion, and sentencing, were scheduled for January 31, 1995.

Dissatisfied with Lyons, Berringer engaged private counsel. On December 28, 1994, while incarcerated, Berringer met with Steele and related a number of purported deficiencies in Lyons's representation, including the failure to gain admission in evidence of fourteen documents that subsequently "disappeared" from the court. Steele advised Berringer that he would file an amended motion for new trial and attempt to secure a bail hearing. According to appellant's malpractice complaint, Steele agreed with Berringer "that the first and most important thing to do was to get a" transcript of appellant's criminal trial, and "Steele *assured* Berringer that Steele would order the Transcript immediately and that Steele should have a copy within a few weeks." Steele further advised Berringer that he would meet with Judge Howe and the prosecutor to ascertain the location of the fourteen missing exhibits. Berringer told Steele that Lyons was hostile in response to Berringer's recommendation that he move for a new trial based on ineffective assistance of counsel. Consequently, Steele advised Berringer that he would note the appeal. Berringer, in turn, assured Steele that his aunt, Ruth Walsh, would furnish any additional money on Berringer's behalf if needed for the appeal.

The following day, December 29, 1994, Gentile brought Berringer an engagement letter, a copy of the motion for new trial filed by Lyons, and a copy of the amended motion for new trial that appellees had filed that day. The letter, which was signed by Steele, said, in relevant part:

Thank you for asking us to represent you in the criminal matter pending before Judge Howe. It is a very interesting case. I think we developed some good ideas in our discussion last night. I have visited Stewart Lyons and left a message with Bruce Penczek[, a certified public accountant,] in order to make arrangements to meet with him to discuss preparation of a financial analysis.

... I am operating under the assumption that Ruth [Walsh] will issue a $20,000.00 check to my firm.... I will deposit the $20,000.00 in our escrow account and bill against it at the rate of $180.00 an hour for my time and $135.00 an hour for Mike Gentile.

I will delegate the primary responsibility for the financial investigation, organization, and compilation to Bruce Penczek. This should help to keep the hourly rates and costs down and enhance the quality of the work. I will pay Bruce Penczek his retainer out of the money we are holding in our escrow account. My plan is to obtain from Stewart Lyons the various records he has, let Bruce Penczek review those, and have Bruce meet with you.

We will send detailed monthly billing statements with a description of our services and the expenses incurred. Interest will be charged at the annual rate of 12% on unpaid balances over 30 days.

You will be responsible for reimbursing us for all advanced expenses that we make such as expert fees, trial transcripts, photocopying, computer research, hand-deliveries, overnight mail, long-distance telephone, and other expenses incurred up to the date of receipt of your written notice.

We reserve the right to withdraw from representation for good cause such as your refusal to cooperate with our office or your failure to maintain an account in good standing. The firm will not discontinue legal services without giving you notice.

\* \* \*

*Our undertaking is to represent you in regard to the reduction of bail, the motion for new trial, and the sentencing before Judge Howe. This agreement does not include an appeal of the conviction.*

If you are in agreement with the above, would you please sign the copy enclosed herein and return it to me. A self-addressed envelope is enclosed for your convenience.

(Emphasis added).

Appellant was dissatisfied with the terms of the agreement, and advised Gentile that Steele should prepare a revised engagement letter to reflect the following: (1) hourly rates of $170 and $125 for Steele and Gentile, respectively, in accordance with discussions during the December 28 meeting; (2) filing a notice of appeal by appellees, with appellees to contact Ruth Walsh if additional funds were required; and (3) Berringer did not want Steele to expend funds on retaining Bruce Penczek to conduct a financial analysis. Nevertheless, Berringer signed and dated the engagement letter on December 29, 1994,[5] although none of the requested changes had been made.

The amended motion for new trial repeated the first five paragraphs of the original motion, renumbered the sixth paragraph as new paragraph 7, and added the following, in part:

6. That, as a third ground, the court erred in evidentiary rulings including the exclusion of evidence related to the Defendant's lack of concealment, the absence of loss on the part of [NCRC], proof that the payments were authorized, that persons other than the Defendant held a majority interest in the corporation, and possible bias on the part of prosecution witness Joanne Hardy and including the denial of Defendant's motion in limine to exclude evidence of $91,042.00 paid to E & L Enterprises in 1991. Error by the

---

**5.** Appellant included an unsigned copy of the letter as an exhibit to his complaint. In support of their motion, appellees included a signed, dated copy of the letter.

court is a ground for granting a new trial. [Citation omitted.]

Steele met with Berringer again on January 6, 1995, and told Berringer that he would revise the engagement letter and submit it to Berringer for his review and signature. Steele also advised appellant that the transcript of the criminal proceeding had been ordered and that it would cost approximately $5,000. Steele also indicated that he was then preparing a notice of appeal, which would be filed shortly. On the same day, Dr. Ellen McDaniel, a forensic psychiatrist, interviewed appellant, notwithstanding that he never approved the retention of Dr. McDaniel. Moreover, Berringer never received any information concerning the results of Dr. McDaniel's interview.

Steele next met with Berringer on January 19, 1995. Berringer again complained about the use of Penczek, requested a revised engagement letter, and inquired as to the notice of appeal. Steele indicated that if Gentile had not already done so, the appeal would be noted later the same day. He also said that he would bring a revised engagement letter with him the following day. Although Steele visited Berringer on January 20, 1995, Steele did not bring an amended engagement letter. He also informed appellant that he had not yet received a copy of the trial transcript, but would make certain that appellant received a copy of the notice of appeal. Steele further suggested that their efforts were best focused on the motion for new trial because, in Steele's opinion, Judge Howe would likely impose a substantial sentence.

At a meeting on January 26, 1995, Steele told Berringer that Gentile had not filed an appeal because Gentile believed it was a waste of time. Furthermore, Steele indicated that he had met with Judge Howe and the prosecutor, and was waiting to hear about the missing documents. Steele also indicated that his office would deliver the trial transcript to Berringer the following day.

According to the complaint, Steele and Gentile telephoned Berringer's wife, the attorneys representing NCRC (which

was then purportedly controlled by the Hardys), and other attorneys who had assisted in the "illegal takeover" of NCRC. These communications were evidenced by an itemized invoice from the Firm to Walsh. Berringer complained that appellees "waste[d] time and money" calling his wife, and expressed his displeasure with appellees' decision to communicate with counsel retained by "adverse" parties.

During a meeting between Steele and Berringer on January 30, 1995, Steele advised Berringer, *inter alia*, that: (1) he had not acted to secure the transcript from the criminal trial; (2) after conversing with "adverse" counsel, he was persuaded of Berringer's guilt; (3) he was convinced that Berringer would receive a substantial prison sentence unless Berringer could convince Walsh not to pursue stock ownership claims against NCRC, and unless Berringer and Walsh agreed not to sue the attorneys who assisted in the takeover of NCRC by the Hardys and Schmidt; (4) if Walsh and Berringer agreed not to sue "everyone involved with the takeover of NCRC", then the only hope would be to ask Judge Howe to reduce any sentence in light of appellant's psychological problems and agreement to house arrest; and (5) he had filed a sentencing memorandum on Berringer's behalf on January 27, 1995, without first consulting with appellant.

Although the complaint indicates that Berringer never received a copy of the sentencing memorandum, a copy was filed in support of the malpractice action. The memorandum first traced appellant's personal background and employment history. It also detailed Dr. McDaniel's recommendation that appellant engage in counseling for at least one year, and indicated that appellant was "willing and able to begin this as soon as he is permitted to attend the counseling sessions at Dr. McDaniel's offices." Additionally, appellant was to participate in a community service program for the homeless through a church in Baltimore. Moreover, the memorandum reported that appellant had been offered employment as a sales executive with the Best Ribbon Corporation and that his hours would be 8:30 a.m. to 6:00 p.m., requiring his absence from home from 7:30 a.m. to 7:00 p.m. Appellees' interpreta-

tion of the sentencing guidelines, reflected in the memorandum, revealed that appellant could be sentenced to six months of probation.

The memorandum also indicated that appellant was involved in Chapter 11 bankruptcy proceedings. A report produced by Penczek was attached to the memorandum, analyzing Berringer's financial situation in light of the bankruptcy and the judgment rendered in the Hardys' wrongful discharge action. The memorandum continued:

In addition, counsel for the defendant have been informed that NCRC has settled its suit against their former accountants for an amount in excess of $300,000. As the Complaint in that matter indicates, the bulk of the compensatory relief sought was for $240,000 which defendant Berringer diverted from the company. The remainder of the compensatory relief sought in that case was for the fees paid to the accountants. In addition, counsel for the defendant have been informed that NCRC obtained a settlement in excess of $500,000 in its litigation against its former attorneys.

It is suggested that the defendant be required to stay within the State of Maryland during the initial period of his employment and only be permitted to travel outside the State of Maryland with the specific approval of the probation officer. While the defendant's earnings would likely be higher if he could travel, perhaps he should demonstrate his ability to perform conditions of counseling, community service, and employment specified above before being permitted to travel outside the state. Additionally, the Court may want to restrict the defendant's mobility by imposing home detention or by using a private monitoring system that would report directly to the probation officer but be paid for by the defendant.

## CONCLUSION

It is submitted that a combination of the conditions suggested above will restrict the defendant's freedom without eliminating his ability to earn an income and to begin to

pay significant debts that he owes. It permits the extent of his freedom and income-producing ability to increase as he demonstrates his commitment to the conditions of counseling and community service and to the terms of monitoring and following a precise schedule and itinerary. A goal of this plan is to make the defendant more aware of the weaknesses and faults and misplaced values that contributed to his undoing. A further objective is to prevent him from engaging in similar conduct in the future. The defendant agrees with this analysis and recommendation and has authorized undersigned counsel to speak for him. He recognizes the wisdom of listening and remaining silent at this time.

On January 31, 1995, shortly before the hearing, Berringer and Steele met again. Steele advised Berringer that he had not received the transcript from appellant's criminal trial and was not prepared to defend the amended motion for new trial. Additionally, Steele indicated that he would not note an appeal of the criminal convictions after the hearing on January 31, 1995, because of insufficient funds.

The hearing on appellant's amended motion for new trial, and sentencing, proceeded as scheduled on January 31, 1995. The court rejected the "first ground" of error alleged in appellant's amended motion, concerning the alleged bias of a juror against Ms. Staab. The following discussion is relevant:

THE COURT: All right. It's the Defense Motion for New Trial.

MR. STEELE: Yeah.

THE COURT: You may proceed.

MR. STEELE: Yes, ma'am. Your Honor, in regard to the Motion for New Trial, uhm, I, I primarily want to submit on virtually everything except the issue involving the juror; I think we can discuss. And she's in the courtroom right now. But I don't want to waive any of the points that we've made. I haven't been able to secure a transcript and I didn't think it was prudent to spend money on a transcript. Frankly, your Honor, I thought it was more prudent to, to

get prepared for sentencing. And, as a consequence, we haven't, uhm, you know, read over the record. Uhm, in, on the issue regarding the, the juror, we've made some inquiries. Today was the first day we were able to talk with her. And perhaps we can state for the record what—

[PROSECUTOR]: I believe we can, your Honor. I can— this is Denise Shipowick, the Juror No. 3 or 4. I don't recall.

THE COURT: No. 3.

[PROSECUTOR]: Specifically, Defense counsel's made several allegations with regard to Miss Shipowick's knowledge of Miss Maria Staab.

THE COURT: Mm-hmm.

[PROSECUTOR]: My understanding, and please correct me if I'm wrong, my understanding is apparently they were neighbors or are neighbors—

MS. SHIPOWICK: Are.

[PROSECUTOR]:—or something. Are neighbors. But my understanding from speak[ing] with Miss Shipowick is that she had no knowledge of that, whatsoever. And, as the Court will recall, Miss Staab never testified—

MS. SHIPOWICK: The—

THE COURT: Right.

[PROSECUTOR]: She had no recollection. No, she did not recognize the name or, obviously, the person of Miss Staab during the course of this trial. Apparently, it was with regard—

MS. SHIPOWICK: Juror—

[PROSECUTOR]:—when she went after the verdict on that day, Miss Shipowick went home and, for the first time, was obviously able to discuss the case with her family. At that time, I believe her son mentioned or heard, was hearing the story, her son mentioned, oh, mom, is that the Maria Staab that lives up the street? At first Miss Shipowick thought, oh, I don't think so. Ultimately, it turns out it was a woman that she knew but, apparently, Miss Shipowick, even in light of that, had no hard feelings or whatever about Miss Staab.

And, again, because it was all after the trial, I don't foresee that it had any bearing on the trial, whatsoever. Miss Shipowick can certainly correct any-, anything that I may have said.

MS. SHIPOWICK: That's, that's accurate, your Honor.

THE COURT: All right. Mr. Steele?

MR. STEELE: I'm satisfied with that statement, your Honor. And I int-, interviewed the juror, also, prior to the proceedings today.

THE COURT: I've read carefully the [case of *Burkett v. State*, 21 Md.App. 438, 319 A.2d 845 (1974) ]. And the test where a juror would fail to respond to a voir dire inquiry is left to the sound discretion of the trial judge unless, A, actual prejudice to the accused is demonstrated or, B, withheld information in and of itself gives rise to a reasonable belief that prejudice or bias by the juror against the accused is likely. And, so, Mr. Steele, if you want to argue either or both of those points, I will certainly entertain an argument.

MR. STEELE: You, your Honor, I don't believe it would be fruitful to argue the point further. I, I talked with the witness this morning. The thing I was primarily—

THE COURT: That's not—

MR. STEELE: I'm sorry. The juror the juror/witness, the thing I was primarily concerned with was that she had heard the name Staab, didn't make further inquiry, didn't raise her hand and didn't do anything about it. What she has told us today negates that.

THE COURT: Okay.

MR. STEELE: So if she were to testify, I don't think I'd have a factual foundation [to] make the argument your Honor. I did feel that I had an obligation to pursue the inquiry. It had been raised by prior counsel, and, and we raised it, as well.

The "second ground" for new trial concerned appellant's entitlement to monies in excess of what he allegedly stole from NCRC. The hearing transcript reveals that Steele attempted

to proceed directly to the "third ground," without addressing the second. Nevertheless, after reiterating the argument underlying the second ground, the court asked Steele if he had "any additional argument." When Steele responded in the negative, the court denied the motion on that basis. The third ground alleged that the court erred in excluding certain evidence and in denying appellant's motion *in limine* to exclude evidence of payments made to E & L in 1991. The following colloquy is pertinent:

> MR. STEELE: You, your Honor, we raised issues insofar as evidentiary—

> THE COURT: Right.

> MR. STEELE:—objections. Particularly on financial information.

> THE COURT: Right.

> MR. STEELE: Uhm, the Court, you know, denied the admission into evidence of those exhibits during the course of the trial. I, I've reviewed them.

> THE COURT: Mm-hmm.

> MR. STEELE: I, I've reviewed them. You know, I would continue to say that the Court should have admitted them and that our client was prejudiced because they weren't admitted. But I think that the Court would really have to recognize or to concede that she was in error at the time that she made those, these rulings. I mean, I don't, as I said, we do not have the transcript, so I am not in a position to argue in any great detail those points. I have reviewed those exhibits, and I've reviewed the exhibits that were admitted and I think I understand the nature of why the Defendant wanted them in and why the Court ruled the way the Court did, your Honor.

* * *

> THE COURT: ... [A]nything further on that other than what you've said today[?]

\* \* \*

MR. STEELE: . . . I don't have anything further to, to add than what, what we've said in the motion.

The court rejected the third argument. After Steele indicated that appellant had no other grounds, the court denied the new trial motion in its entirety.

During the sentencing phase of the hearing, Steele elaborated upon the points addressed in the sentencing memorandum. With respect to the proposed counseling, Steele said:

We have come to agreement among ourselves as things, as to the various things that he would be willing to do and that we think would be constructive for him to do in the next year or two years. First of all is counseling. I, I asked Dr. McDaniel [to] see the Defendant and evaluate him. She is willing to continue to work with him as far as the counseling is concerned. I think that the Defendant has suffered from too much optimism, too much salesmanship, a, you know, lack of a hold on, on reality. And I, and I do have some concerns that, without examining himself, and getting professional examination, evaluation and counseling that a psychiatrist could give . . . him, that he could get himself again in, you know, financial difficulties similar to what, you know, brought about this case.

In the malpractice complaint, Berringer alleged that he advised Steele that he wanted to address the Court at sentencing. Nevertheless, the record at sentencing reflects that appellant declined to allocute. The following exchange is relevant:

THE COURT: . . . Does Mr. Berringer wish to address the Court today by way of allocution?

MR. STEELE: Your Honor, we've spoken about this and, very frankly—and I trusted in our memo I think some, one of the things that has gotten him into difficulty is he's, talks too much. And I've . . . advised him that I think it's in his best interests not to, to speak today, but to . . . accept what we have said on his behalf. Uhm, do you agree with that?

[BERRINGER]: Yes, sir.

THE COURT: So you—he waives his right of allocution; is that correct?

MR. STEELE: That's correct, your Honor.

THE COURT: Okay.

MR. STEELE: You understand that?

[BERRINGER]: Yes.

Thereafter, the court merged appellant's fraudulent misappropriation conviction with the theft conviction and sentenced Berringer to fifteen years of imprisonment, with all but three years suspended, and credit for forty-three days of time served. Appellant was to be incarcerated for the first year of his sentence and, in accordance with Steele's proposal, he was then to be placed in home detention for two years. During that period, appellant would be permitted to work, attend weekly religious services, and participate in counseling. Additionally, the court ordered appellant to pay restitution of $227,191.25 to NCRC "during [appellant's] seven-year period of probation." [6]

On May 1, 1995, Steele filed a motion for modification and reduction of sentence, as well as another motion for new trial, pursuant to Md. Rule 4–331(b), (c). Both motions were denied. No appeal was filed as to the conviction or post-trial motions.

By letter dated August 18, 1995, Steele notified Berringer that appellees intended to withdraw their appearance. The letter stated: "I remain interested in assisting you, but at the present time we are approximately $15,000.00 in the hole." Judge Howe granted appellees' motion.

---

**6.** Although unclear from the record, the circuit court appears to have relied on Md.Code (1957, 1996 Repl. Vol., 1999 Supp.), Art. 27, § 641A(a) ("Art.27"), in setting the seven-year probationary period. Section 641(a)(4) provides that, "if the defendant consents in writing, the court may grant probation in excess of 5 years, but only for purposes of making restitution."

On November 15, 1995, appellant appeared before Judge Howe on a charge of violation of probation. Although somewhat unclear from the record, it appears that the alleged violation included a series of threatening telephone calls to the Hardys. Notwithstanding Berringer's steadfast denial of any wrongdoing, the court found appellant in violation, revoked his probation, and imposed the entire fifteen-year sentence. Appellant's subsequent appeal was dismissed for failure to prosecute. Thereafter, on December 6, 1995, Berringer applied for review of his sentence by a three-judge panel. On May 22, 1996, the panel upheld the sentence.

Appellant filed a petition for post conviction relief on November 5, 1996, which was heard and decided by Judge Brennan. The petition was premised on the alleged ineffective assistance of appellant's trial counsel. In his opinion and order of August 25, 1997,[7] Judge Brennan found that Lyons's representation of Berringer "was below objectively reasonable standards as measured against prevailing professional norms" and resulted in "actual prejudice." Accordingly, the court granted the petition and awarded a new trial. On September 24, 1997, the State responded by applying to this Court for leave to appeal the order.

While the State's application was pending in this Court, appellant instituted the legal malpractice action against appellees at issue here. On January 30, 1998, through Nathaniel E. Jones, Jr., Esquire and Jones's firm (collectively, "Jones"),[8] appellant filed a five-count complaint. The first three counts, directed at Steele, Gentile, and the Firm, alleged breach of contract (Count I); negligent representation (Count II); and breach of fiduciary duty (Count III). An additional count,

---

7. The opinion and order was attached as an exhibit to the malpractice complaint. It recounts facts that we have included in regard to the violation of probation and events subsequent to it.

8. Jones represented appellant in April 1997, at a hearing before Judge Brennan on appellant's post conviction petition. Between the time appellees withdrew from the case and Jones began representation, appellant was represented by other counsel.

lodged against the Firm, asserted negligent supervision (Count IV). Count V alleged intentional misrepresentation by Steele and Gentile.

Although segmented into separate counts, the complaint was premised principally on the following failings: (1) appellees did not adequately prepare to argue appellant's motion for new trial and presented a defective argument at the hearing on that motion; (2) appellees presented positions to the court regarding sentencing of which appellant had not been previously advised and which were contrary to appellant's instructions; (3) appellees did not file a petition for bail or arrange a bail hearing; and (4) appellees failed to note an appeal of Berringer's criminal conviction. Count V also included sixteen alleged false representations made by either Steele or Gentile in the course of representation. In addition, the alleged damages Berringer sustained as a result of each count were identical, and included:

(1) the loss of $20,000.00 paid to [the Firm]; (2) the loss of [Berringer's] employment and loss of income due to his incarceration for twenty eight months and continuing; (3) being wrongfully incarcerated in Maryland prisons and having lost his liberty for 28 months and continuing and; (4) the loss of his wife and child after 7 years of marriage due to his being incarcerated for over 28 months; (5) mental and physical pain and anguish, and (6) professional and personal ruin.

Appellees responded by filing a motion to dismiss or, in the alternative, for summary judgment, stating, in pertinent part:

1. Plaintiff cannot maintain a claim against Defendants based on their alleged failure to file an appeal because Defendants specifically declined to undertake the representation of Plaintiff with respect to an appeal of his criminal conviction. The Plaintiff, by contract concurred.

2. Plaintiff cannot maintain a claim against Defendants based on alleged inadequate representation at the January 31, 1995 hearing on the motion for a new trial and the

sentencing as any such claim necessarily constitutes an impermissible attack on Defendant's trial strategy.

3. Plaintiff cannot maintain any of the claims set forth in the Complaint because he cannot demonstrate that any act or omission on the part of Defendants proximately caused him any damage.

4. Plaintiff cannot maintain any of the claims set forth in the Complaint because he failed to obtain post conviction relief against of [sic] the Defendants.

Appellant filed an opposition to appellees' motion, to which appellees replied. Thereafter, on October 26, 1998, appellant filed: (1) a "Surreply to Defendants' Reply to Plaintiff's Opposition to Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (the "Surreply"), and (2) a "Supplemental Surreply to Defendants' Reply to Plaintiff's Opposition to Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (the "First Supplemental Surreply").

The First Supplemental Surreply was evidently intended to update the circuit court on the status of the State's application for leave to appeal the order of August 26, 1997, granting a new trial. In an unreported opinion, a panel of this Court granted the State's application. *State v. Berringer,* No. 212, Sept. Term 1997 (filed Sept. 29, 1998) (*"Berringer I "*). There, we said that "[t]o demonstrate ineffective assistance of counsel, a defendant must show that: '(1) counsel's performance was deficient, *and* (2) the deficient performance prejudiced the defense.' " *Id.,* slip op. at 1 (quoting *Harris v. State,* 303 Md. 685, 696, 496 A.2d 1074 (1985)). Because we concluded that the prejudice prong had not been established, slip op. at 8, we granted the State's application and vacated the order granting a new trial. *Id.* Appended to the First Supplemental Surreply was a draft copy of the motion for reconsideration that appellant intended to file in this Court.

The circuit court (Daniels, J.) held a hearing on appellees' motion for summary judgment on October 26, 1998. It reserved ruling and, by letter dated November 23, 1998, informed counsel:

The Plaintiff's [sic] argue that the favorable judicial ruling on Mr. Berringer's Complaint For Post Conviction Relief, at the very least, generates a material dispute as to the facts in this case. That argument has some allure. Accordingly, I propose that I hold Defendant's Motion for Summary Judgment *sub curia* pending the outcome of the State's appeal of Judge Brennan's grant of post conviction relief.

Appellant file a motion for reconsideration of this Court's decision in *Berringer I* on October 29, 1998, and a copy was attached to a "Second Supplemental Surreply," filed in the circuit court on October 30, 1998. In a "Third Supplemental Surreply to Defendants' Reply to Plaintiff's Opposition to Motion to Dismiss, or in the Alternative, Motion for Summary Judgment" (the "Third Supplemental Surreply"), filed on December 30, 1998, appellant advised the circuit court that this Court had denied reconsideration and that a petition for certiorari was pending in the Court of Appeals. By letter of January 28, 1999, appellant's attorney advised the court that certiorari was denied on January 14, 1999. In addition, appellant's counsel said:

[N]otwithstanding the Court of Appeals' denial of Berringer's Petition for Writ of Certiorari, Berringer still has the right to, and fully intends to, file a petition for writ of habeas corpus in the United States District Court for the District of Maryland, asserting as the bases for relief essentially the same bases asserted in support of his State Petition for Post Conviction Relief. Accordingly, given the availability of this federal remedy to Berringer, Defendants' position that Berringer has not been granted post-conviction relief has not been fully resolved, and thus, the purported absence of such relief cannot serve as a basis for granting Defendants' Motion for Summary Judgment.

The record does not reflect that appellant thereafter filed a petition for habeas corpus relief. But, appellant advised us in his brief that the habeas petition was filed after the circuit court issued its ruling on April 14, 1999, and that the matter was still pending when the briefs were filed with this Court.

In its ruling of April 14, 1999, the court treated appellees' motion as one for summary judgment, *see* Md. Rule 2–322(c), and relied on our opinion in *Berringer I.* The court found several facts as undisputed:

1. The Amended Motion For A New Trial, filed by the Defendants on behalf of the Plaintiff, was heard and disposed of on the date of the Plaintiff's sentencing by Judge Howe, January 31, 1995.

2. The Plaintiff was aware that the Defendants "had decided not to file for an appeal 'after today's hearing' 'because he was out of money;' ". Complaint ..., Paragraph 46(c), page 22.

3. Plaintiff contends that his trial counsel committed numerous delicti which resulted in an unjustified verdict of guilty in the underlying criminal case. Complaint ..., paragraphs 11 through 22, pages 8 through 12.

4. In its opinion vacating the grant of post conviction relief, the Court of Special Appeals found,

Nothing that the hearing judge said or that Mr. Berringer has said in his reply application has shown that defense counsel's actions caused any prejudice to Mr. Berringer's defense. Because no showing has been made that defense counsel's representation prejudiced the defense, no basis exists to rule that the defense counsel rendered ineffective assistance. [*Berringer I,* slip op. at] 8.

The court then turned to its conclusions of law, stating, in part:

1. Plaintiff argues that a genuine dispute exists as to whether or not the Defendants had undertaken the responsibility of noting an appeal in Plaintiff's criminal case. Assuming *arguendo* that such a dispute does exist, there is no dispute that the Plaintiff knew of the Defendants' decision not to note an appeal as early as January 26, 1995. Because the Plaintiff knew of the Defendants' decision not to note an appeal as of that date, it was then incumbent upon the [Plaintiff] to take whatever means were necessary to file the Notice of Appeal on his own behalf. By rule, he

had thirty days from the date of the sentencing, January 31, 1995, within which to note his appeal. The Court concludes that the failure of the Plaintiff to cause a Notice of Appeal to be filed, after having been so apprised, amounts to contributory negligence and a failure to mitigate contract damages as a matter of law.

2. Plaintiff asserts that the Defendants were negligent in failing to raise all instances of ineffective assistance of trial counsel at the hearing on Plaintiff's Motion for New Trial before Judge Howe. [*Berringer I*] eviscerates this argument. Because the Court of Special Appeals ruled that Plaintiff failed to prove that trial counsel had prejudiced his case in any way, the Court concludes as a matter of law that had the Defendants, in this case, raised the issue of ineffective assistance of counsel before Judge Howe, she would have, and should have, denied Plaintiff's Motion For New Trial. In essence, [*Berringer I*] precludes a finding that the Defendants in this case were negligent in not raising the deficiencies of trial counsel because trial counsel did nothing to prejudice the Plaintiff's criminal defense.

\* \* \*

... The Plaintiff ... argued the issue of ineffective assistance of trial counsel before the Court of Special Appeals without success. That ruling should bar him from attempting to obtain the opposite result in his civil case.

\* \* \*

A significant number of states have held that a successful ruling in a post conviction proceeding is a precondition for bringing an attorney malpractice case. Likewise, a number of courts have precluded the prosecution of legal malpractice claims against a trial attorney by a convicted defendant who has been unsuccessful in obtaining post conviction relief.

* * *

This Court fully anticipates the Plaintiff will question the applicability of a rule of law barring him from bringing an action for malpractice against the Defendants in this case when the Court of Special Appeals passed judgment only on his claims of ineffective assistance on the part of trial counsel in the criminal case. The Court responds by pointing out that Plaintiff's only allegation of negligence, aside from the failure to note an appeal, was Defendant's failure to argue the deficiencies of trial counsel before Judge Howe. Because the Court of Special Appeals has found Plaintiff's claims of ineffective assistance of trial counsel to be groundless, *ipso facto*, there can be no negligence for failing to argue those deficiencies before Judge Howe.

(Citations omitted) (footnotes omitted).

Consequently, the court granted summary judgment in favor of appellees. Berringer's subsequent motion to alter or amend judgment was denied.

We shall include additional facts in our discussion.

## STANDARDS OF REVIEW

 "Summary judgment is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *King v. Board of Educ.*, 354 Md. 369, 376, 731 A.2d 460 (1999); *see* Md. Rule 2–501(e); *Philadelphia Indem. Ins. Co. v. Maryland Yacht Club,. Inc.*, 129 Md.App. 455, 465, 742 A.2d 79 (1999); *Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md.App. 381, 386, 693 A.2d 370 (1997). In reviewing the circuit court's grant of summary judgment, we evaluate "the same material from the record and decide[ ] the same legal issues as the circuit court." *Lopata v. Miller*, 122 Md.App. 76, 83, 712 A.2d 24, *cert. denied*, 351 Md. 286, 718 A.2d 234 (1998).

 In order to proceed to trial, the non-moving party must first produce evidence of a disputed material fact. *See Scroggins v. Dahne*, 335 Md. 688, 691, 645 A.2d 1160 (1994);

*Wankel v. A & B Contractors, Inc.*, 127 Md.App. 128, 156, 732 A.2d 333, *cert. denied*, 356 Md. 496, 740 A.2d 614 (1999). A material fact is one that will alter the outcome of the case, depending upon how the fact-finder resolves the dispute. *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985); *Faith v. Keefer*, 127 Md.App. 706, 734, 736 A.2d 422, *cert. denied*, 357 Md. 191, 742 A.2d 521 (1999). In opposing the motion, the non-moving party must present more than "mere general allegations which do not show facts in detail and with precision." *Beatty v. Trailmaster Prods., Inc.*, 330 Md. 726, 738, 625 A.2d 1005 (1993). Moreover, the court views the facts, and all reasonable inferences drawn from the facts, in the light most favorable to the non-moving party. *Dobbins v. Washington Suburban Sanitary Comm'n*, 338 Md. 341, 345, 658 A.2d 675 (1995); *Electronics Store, Inc. v. Cellco Partnership*, 127 Md.App. 385, 395, 732 A.2d 980, *cert. denied*, 356 Md. 495, 740 A.2d 613 (1999).

 When there are no disputes of material fact, the court may resolve the case as a matter of law. *See* Md. Rule 2–501(e). In reviewing the trial court's decision, we determine whether the court reached the correct legal result. *Beatty*, 330 Md. at 737, 625 A.2d 1005. Generally, we review an award of summary judgment "only on the grounds relied upon by the trial court." *Blades v. Woods*, 338 Md. 475, 478, 659 A.2d 872 (1995). But, "[i]f the alternative ground is one upon which the circuit court would have had no discretion to deny summary judgment, summary judgment may be granted for a reason not relied upon by the trial court." *Davis v. Goodman*, 117 Md.App. 378, 395 n. 3, 700 A.2d 798 (1997) (citing *Blades*, 338 Md. at 478, 659 A.2d 872); *accord Suburban Hosp., Inc. v. Maryland Health Resources Planning Comm'n*, 125 Md.App. 579, 587 n. 1, 726 A.2d 807, *cert. granted*, 354 Md. 570, 731 A.2d 969 (1999). When a motion is based solely "upon a pure issue of law that could not properly be submitted to a trier of fact," then "we will affirm on an alternative ground." *Davis*, 117 Md.App. at 395 n. 3, 700 A.2d 798.

 We review a circuit court's denial of a motion to alter or amend judgment on an abuse of discretion standard. *Friends of the Ridge v. Baltimore Gas & Elec. Co.,* 120 Md.App. 444, 490, 707 A.2d 866 (1998), *vacated on other grounds,* 352 Md. 645, 724 A.2d 34 (1999). "We will find an abuse of discretion only if·'the ruling either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective.' " *Scamardella v. Illiano,* 126 Md.App. 76, 91, 727 A.2d 421 (quoting. *North v. North,* 102 Md.App. 1, 14, 648 A.2d 1025 (1994)), *cert. denied,* 354 Md. 115, 729 A.2d 406 (1999); *cf. In re Adoption/Guardianship No. 3598,* 347 Md. 295, 312, 701 A.2d 110 (1997) ("Questions within the discretion of the trial court are 'much better decided by the trial judges than by appellate courts . . . .' " (citation omitted)).

## DISCUSSION

### I.

Appellant complains that, in awarding summary judgment, the circuit court incorrectly relied on his failure to obtain post conviction relief of his criminal conviction.[9] Referring to our decision in *Fischer v. Longest,* 99 Md.App. 368, 637 A.2d 517, *cert. denied,* 335 Md. 454, 644 A.2d 488 (1994), appellant avers that Maryland jurisprudence does not require a criminal defendant to obtain post conviction relief prior to initiating a legal malpractice action against a former defense attorney.[10] Appellees counter that post conviction relief is a necessary

---

**9.** In common parlance, "post conviction" ordinarily refers to proceedings initiated pursuant to Art. 27, § 645A. In this opinion, however, our use of the term refers generally to various legal proceedings that occur subsequent to trial, including appeals, habeas corpus, and statutory post conviction proceedings.

**10.** Berringer further asserts that the denial of his petition for post conviction relief, which was premised on ineffective assistance of counsel, had no relation to whether (1) the motion for new trial would have been granted, or (2) an appeal would have resulted in a vacation of the criminal judgments against him and a new trial. For the reasons that follow, we consider it unnecessary to address these contentions.

predicate to the maintenance of a legal malpractice suit by a criminal defendant. Alternatively, appellees suggest that Berringer's failure to obtain such relief precludes him from establishing proximate causation, a necessary element to a legal malpractice claim.

 The elements of a legal malpractice action in a civil case include: (1) the employment of the lawyer, (2) the lawyer's neglect of a duty, and (3) loss to the client proximately caused by the neglect of duty. *Thomas v. Bethea,* 351 Md. 513, 528–29, 718 A.2d 1187 (1998); *Cavacos v. Sarwar,* 313 Md. 248, 253, 545 A.2d 46 (1988); *Kendall v. Rogers,* 181 Md. 606, 611, 31 A.2d 312 (1943). Focusing on the third element in *Fishow v. Simpson,* 55 Md.App. 312, 323, 462 A.2d 540 (1983), we said that unless the client "has a good cause of action against the party proposed to be sued, the first party loses nothing by the conduct of his attorney even though the latter were guilty of gross negligence." In support of this statement, we cited the case of *Niosi v. Aiello,* 69 A.2d 57, 60 (D.C.1949). There, the court explained:

> The rule to be applied in a case where an attorney is accused of negligence in the conduct of litigation is that such attorney is not liable for negligence if, notwithstanding the negligence, the client had no cause of action or meritorious defense as the case may be; or that if conduct of an attorney with respect to litigation results in no damage to his client the attorney is not liable.

*See* 7A C.J.S. *Attorney & Client* § 258 (1980).

 Thus, in order to recover, the client must establish that he or she probably would have prevailed in the underlying action, but for the lawyer's negligence, and that the litigant was harmed by the lawyer's conduct. *Cf. Riordan v. Jones,* 793 F.Supp. 650, 651 (D.Md.1992) ("[T]he matter for which the attorney was engaged must have had sufficient merit that any malpractice actually caused damages to the plaintiff. This requires that the malpractice plaintiff demonstrate merit in the underlying claim ...." (citing *Fishow,* 55 Md.App. at 323, 462 A.2d 540)), *aff'd,* 989 F.2d 494 (4th Cir.1993); *Brown v. E.W. Bliss Co.,* 72 F.R.D. 198, 200

**474**

(D.Md.1976) (stating that, to recover under a malpractice theory against their attorney, the plaintiffs need "prove that they had a proper claim and are entitled to damages, and further allege and show that their failure to recover on their claim was due to the negligence of their attorney").

But, we are not presented here with a "civil malpractice" claim. Instead, appellant has charged "criminal malpractice," i.e., legal malpractice arising from a criminal prosecution. *See* Otto M. Kaus & Ronald E. Mallen, *The Misguiding Hand of Counsel—Reflections on "Criminal Malpractice,"* 21 UCLA L.Rev. 1191, 1191 n. 2 (1974) (using the term "criminal malpractice" to describe a situation involving "legal malpractice in the course of defending a client accused of a crime" and referring to "civil malpractice" as its counterpart).[11] Until recently, few so called criminal malpractice cases were found among the reported opinions of any jurisdiction. *See* Kaus & Mallen, *supra*, at 1192–93. Nevertheless, courts have been increasingly confronted with these kinds of cases and have, for reasons of public policy, expanded the requirements of a criminal malpractice action beyond those of one sounding in civil malpractice. *See* 3 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 25.3 (4th ed. 1996 & Supp.1999)[12]; Robert J. Hoffman, *Legal Malpractice in the Criminal Context: Is Postconviction Relief Required?*, Fla. B.J., Jan. 2000, at 66.

Many courts hold that successful post conviction relief is a predicate to maintenance of a criminal malpractice action. *See, e.g., Shaw v. State*, 816 P.2d 1358, 1360 (Alaska 1991) ("*Shaw I*"); *Steele v. Kehoe*, 747 So.2d 931, 933 (Fla.1999); *Johnson v. Schmidt*, 719 S.W.2d 825, 826 (Mo.Ct.App.1986); *Morgano v. Smith*, 110 Nev. 1025, 879 P.2d 735, 737–38 (1994); *Carmel v. Lunney*, 70 N.Y.2d 169, 518 N.Y.S.2d 605, 511

---

**11.** For convenience, we have adopted the terms "criminal malpractice" and "civil malpractice" as used by Kaus and Mallen. Additionally, we will generally refer to the former criminal defendant/present civil plaintiff in a criminal malpractice case as the "criminal plaintiff."

**12.** All references to Mallen & Smith are to the 1996 edition, unless otherwise indicated.

N.E.2d 1126, 1128 (1987); *Stevens v. Bispham*, 316 Or. 221, 851 P.2d 556, 561 (Or.1993); *Bailey v. Tucker*, 533 Pa. 237, 621 A.2d 108, 113 (1993); *Gibson v. Trant*, No. M1999–00390–COA–R3–CV, 2000 WL 320666, at *2 (Tenn.Ct.App. March 29, 2000) (unreported); *Peeler v. Hughes & Luce*, 909 S.W.2d 494, 497–98 (Tex.1995) (*"Peeler II "*); *Peeler v. Hughes & Luce*, 868 S.W.2d 823, 831–32 (Tex.App.1993) (*"Peeler I "*), *aff'd*, 909 S.W.2d 494 (Tex.1995); *Adkins v. Dixon*, 253 Va. 275, 482 S.E.2d 797, 801, *cert. denied*, 522 U.S. 937, 118 S.Ct. 348, 139 L.Ed.2d 270 (1997); *cf. Heck v. Humphrey*, 512 U.S. 477, 486–87, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (holding that "to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a [42 U.S.C.] § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal ..., or called into question by federal court's issuance of writ of habeas corpus" (footnote omitted)).

Several of the same jurisdictions, as well as others, require some showing that the criminal plaintiff was innocent of the criminal charges. *See, e.g., Wiley v. County of San Diego*, 19 Cal.4th 532, 79 Cal.Rptr.2d 672, 966 P.2d 983, 991 (1998); *Gomez v. Peters*, 221 Ga.App. 57, 470 S.E.2d 692, 695–96 (1996); *Kramer v. Dirksen*, 296 Ill.App.3d 819, 231 Ill.Dec. 169, 695 N.E.2d 1288, 1290, *appeal denied*, 179 Ill.2d 585, 235 Ill.Dec. 565, 705 N.E.2d 438 (1998); *Ray v. Stone*, 952 S.W.2d 220, 224 (Ky.Ct.App.1997); *Glenn v. Aiken*, 409 Mass. 699, 569 N.E.2d 783, 785–86 (1991); *Morgano*, 879 P.2d at 738; *Mahoney v. Shaheen, Cappiello, Stein & Gordon, P.A.*, 143 N.H. 491, 727 A.2d 996, 998–99 (1999); *Carmel*, 518 N.Y.S.2d 605, 511 N.E.2d at 1128; *Bailey*, 621 A.2d at 113; *Peeler II*, 909 S.W.2d at 497; *Peeler I*, 868 S.W.2d at 831–32; *see also Lamb v. Manweiler*, 129 Idaho 269, 923 P.2d 976, 979 (1996) (setting forth elements of civil malpractice and noting that criminal plaintiff did not dispute that, in a criminal malpractice action, criminal plaintiff "must establish the additional element of actual innocence of the underlying criminal charges"); *cf. Shaw v. State*, 861 P.2d 566 (Alaska 1993) (*"Shaw II "*) (con-

cluding that innocence was relevant, but holding that lawyer/defendant may raise issue of the criminal plaintiff's guilt as an affirmative defense).

Many of the cases that have made post conviction relief an element of a criminal malpractice suit rely on public policy considerations. First, absent relief from a conviction or sentence, the criminal plaintiff's own actions are presumably the proximate cause of injury. *See Shaw I*, 816 P.2d at 1361; *Steele*, 747 So.2d at 933; *Carmel*, 518 N.Y.S.2d 605, 511 N.E.2d at 1128; *Gibson*, 2000 WL 320666, at *6; *Peeler II*, 909 S.W.2d at 497–98; *Peeler I*, 868 S.W.2d at 831–32; *Adkins*, 482 S.E.2d at 801–02. Second, requiring relief promotes judicial economy by avoiding the duplication of litigation in a criminal malpractice case that was previously litigated and resolved in a post conviction or appellate proceeding. *See Shaw I*, 816 P.2d at 1361; *Steele*, 747 So.2d at 933; *Stevens*, 851 P.2d at 562; *cf. Johnson*, 719 S.W.2d at 826 ("If appellant is not successful in his pursuit of post-conviction relief, then he is barred by collateral estoppel form pursuing his alleged legal malpractice claim."). Third, "appellate, post conviction, and habeas corpus remedies are available to address ineffective assistance of counsel." *Steele*, 747 So.2d at 933; *see Morgano*, 879 P.2d at 737 n. 3. Fourth, "there is a concern about the litigious persons who occupy the time of their incarceration by pursuing civil actions against their former attorneys." 3 Mallen & Smith, *supra*, § 25.3, at 240; *accord Shaw I*, 816 P.2d at 1361; *see Stevens*, 851 P.2d at 562–63.

Not all jurisdictions require a criminal plaintiff to obtain appellate or post conviction relief as a predicate to a criminal malpractice action, however. In *Krahn v. Kinney*, 43 Ohio St.3d 103, 538 N.E.2d 1058 (1989), the Ohio Supreme Court refused to require reversal of the criminal plaintiff's conviction as an additional element to a criminal malpractice action, treating criminal and civil malpractice claims alike. *Id.* at 1060–61. Nevertheless, the court recognized "that in most cases the failure to secure a reversal of the underlying criminal conviction may bear upon and even destroy the plaintiff's ability to establish the element of proximate cause." *Id.* at

1062. Moreover, the *Krahn* court acknowledged that collateral estoppel could preclude litigation concerning "[w]hether a conviction resulted from a defense attorney's incompetence" if the issue was raised in and determined by a prior post conviction proceeding premised on ineffective assistance of counsel. *Id.*

The decisions of the Alaska Supreme Court in *Shaw I*, 816 P.2d 1358, and *Shaw II*, 861 P.2d 566, illustrate the thorny issues that these cases present. The facts underlying both appeals are identical. John Shaw and a co-defendant were charged with burglary and larceny. David Backstrom, a public defender, represented both defendants. Despite Backstrom's statement to the trial court of a conflict that arose during his dual representation of the defendants, new counsel was not provided. Both men were subsequently convicted in March 1973. Although Backstrom had told Shaw that he would later contact him and file an appeal, he did neither. Prior to sentencing, Shaw left the jurisdiction. More than six years later, during a routine traffic stop, an outstanding warrant was discovered and Shaw was charged with failure to appear. At a subsequent sentencing hearing on the burglary and larceny convictions, the trial court suspended imposition of sentence and placed Shaw on probation. Thereafter, at his trial for failure to appear, Shaw was convicted and sentenced to three years of incarceration, of which two years were suspended. While appeal of that conviction was pending, Shaw was arrested for receiving a stolen handgun and being a felon in possession of a handgun. The larceny charge was later dropped and Shaw pleaded *nolo contendre* to the possession charge.

In 1986, Shaw successfully moved to set aside the 1973 convictions on constitutional grounds. Then, in January 1988, Shaw filed a criminal malpractice action against Backstrom. The trial court granted Backstrom's motion for summary judgment based on the statute of limitations. Citing public policy considerations, the Alaska Supreme Court reversed and remanded. *Shaw I*, 816 P.2d at 1360–61, 1363. The court held "that a convicted criminal defendant must obtain post-

conviction relief before pursuing an action for legal malpractice against his or her attorney," *id.* at 1360, and concluded that the statute of limitations for a legal malpractice action does not begin to run until after the grant of post conviction relief. *Id.* On remand, Shaw was required to establish that Shaw's injuries were proximately caused by Backstrom's negligent legal representation at trial, and damages. Moreover, Backstrom had the burden of proving, by a preponderance of evidence, the affirmative defense that Shaw was guilty of the 1973 burglary and larceny charges.

In the parties' second appeal to the Alaska Supreme Court, the court was asked to consider the relevance of a criminal defendant's innocence in a criminal malpractice claim against a former defense lawyer. *Shaw II*, 861 P.2d at 569–70. The court observed that, in the "cases that have addressed the issue of a criminal defendant's guilt, the vast majority of courts have held that innocence or the actual guilt [13] of the criminal defendant is relevant." *Id.* at 570 (footnote omitted). The court concluded that guilt was relevant but, unlike other courts, it declined to place the burden of proving actual innocence on the criminal plaintiff. *Id.* at 572. It said: "Rather than require the plaintiff to prove his actual innocence in order to succeed, we hold that the defendant may raise the issue of the plaintiff's actual guilt as an affirmative defense." *Id.*

With this background in mind, we turn to consider our decision in *Fischer v. Longest*, 99 Md.App. 368, 637 A.2d 517. Relying on *Fischer*, appellant argues here, as he did below, that post conviction relief is not a precondition to pursuit of a criminal malpractice action. *Fischer* did not resolve, in cases of criminal malpractice arising out of an alleged wrongful conviction or sentence, whether (1) post conviction relief is a

---

13. The Court noted a distinction between "legal" guilt or innocence and "actual" guilt or innocence. *Shaw II*, 861 P.2d at 570 n. 3. It said that "legal" guilt or innocence "is that determination made by the trier of fact in a criminal trial," while "actual" guilt refers to a civil trial's determination, by a preponderance of the evidence, of the guilt of the accused. *Id.*

precondition to the initiation or pursuit of a malpractice action, or (2) a showing of actual innocence is required for recovery. Rather, *Fischer*'s significance stems from its declaration that a criminal plaintiff may be entitled to recover damages for ineffective representation resulting in harm short of a wrongful conviction or sentence. We explain further.

In *Fischer*, the criminal plaintiff, Ray Fischer, had engaged the appellees to represent him in connection with federal criminal charges, and with regard to his interests in certain real and personal property. Although the appellees filed various motions, Fischer was dissatisfied with their work and discharged them approximately four months after they were retained. Fischer was in pre-trial detention for several months before being released on bond. Through new counsel, Fischer negotiated a plea agreement with the government and was convicted of two crimes, for which he was sentenced to two consecutive, suspended five year terms.

Thereafter, Fischer initiated a civil suit against the appellees, charging his former attorneys with malpractice, fraud, conversion, and conspiracy. As to the malpractice count, Fischer alleged ten failings:

(1) failure to take any measures to seek his release on bond, (2) failure to investigate the charges against him, (3) disclosure of confidential information to the Government, (4) failure to "adequately protect [Fischer's] rights," including the failure to file "appropriate" motions and to properly research and draft the motions they did file, (5) failure to obtain information concerning the expungement of appellant's prior conviction in California, (6) failure to discuss with him his right to a preliminary hearing and the recommendation that he waive such a hearing, (7) failure to communicate with him, explain his options, and assess his chance of conviction, (8) failure to obtain his consent to the entry of a plea of insanity, (9) failure to preserve and protect his real and personal property, and (10) failure to provide an accounting of the time spent on his case.

*Id.* at 374, 637 A.2d 517. Fischer also listed the damages that were proximately caused by these negligent acts: "(1) incar-

ceration for ten months, (2) loss of real and personal property, (3) payment for services with little or no value and no benefit, (4) loss of credit and eligibility for refinancing of his real property, (5) physical injury suffered while incarcerated, and (6) psychological and emotional distress." *Id.* at 379, 637 A.2d 517.

After answering Fischer's complaint, the appellees moved to dismiss the malpractice claim on the ground that Fischer failed to plead cognizable harm. The appellees maintained that Fischer had never attacked his criminal conviction or his sentence and, because Fischer received credit for his pre-trial detention, he was not harmed. *Id.* at 375, 637 A.2d 517. The court granted the motion. *Id.*

In connection with the malpractice claim, Fischer asked this Court to determine "[w]hether it is a prerequisite in a legal malpractice action arising from a criminal case, where a wrongful criminal conviction is *not* one of the damages for which compensation is sought, that the plaintiff first establish ineffective assistance of counsel in a post-conviction proceeding in the criminal case." *Id.* at 376, 637 A.2d 517. Although we acknowledged that the issue, as framed by Fischer, was one of first impression, *id.*, we concluded that the case was an inappropriate vehicle to resolve the question, because Fischer "never asserted that his conviction or sentence were the product of [the] alleged failings, or were otherwise unjust or unlawful." *Id.* at 378, 637 A.2d 517. Additionally, we noted that Fischer was satisfied with the ultimate outcome of the criminal proceeding, and did not argue that the appellees' alleged malpractice contributed to his conviction or sentence. Instead, Fischer's complaint focused on the claim that the appellees' malpractice resulted in a lengthier pre-trial detention than was necessary and a loss of property. As we stated: "No direct or collateral attack on his conviction could possibly have resolved those complaints." *Id.* at 378, 637 A.2d 517. We continued:

> [The a]ppellees contend, however, that, for reasons of public policy, the law should not permit a malpractice claim

against an attorney based on ineffective representation in a criminal case unless the plaintiff can show that the end product of that malpractice *was* an unjust conviction or sentence. They urge that the law not recognize any prejudice short of wrongful conviction or sentence and thus, in particular, that it give no regard to a claim of unnecessary pre-trial detention which, they contend, can never be prejudicial because, as a matter of law, the plaintiff/criminal defendant must receive credit for it when the ultimate sentence is imposed.

We reject that argument. For one thing, it overlooks the case in which the plaintiff was ultimately acquitted, placed on probation without entry of judgment, had imposition of sentence suspended, or had execution of sentence suspended. In those situations, the plaintiff would not have received credit for pretrial detention, for there would be nothing against which to apply the credit, and, if that detention was indeed the result of attorney malpractice, the plaintiff would certainly have suffered harm.

Nor can we discern any public policy reason for refusing, as a matter of law, to recognize harm short of an unjust and unsatisfactory end result. Such harm can accrue from malpractice, in both civil and criminal proceedings, and, if sufficiently distinct from the ultimate judgment, there is no reason why, if the other elements of the tort are shown, the law should not allow compensation for it. We do not suggest, and certainly do not hold, that every alleged misstep along the way suffices to support a malpractice claim, simply because some additional cost, delay, expense, deprivation, or annoyance may result, where no complaint is made about the ultimate judgment. It is only where the malpractice produces a specific and significant harm that is distinct from and not, in an overall sense, compensated for by the ultimate judgment that an action may lie.

*Id.* at 378–79, 637 A.2d 517.

We concluded that, with the exception of the pre-trial detention, Fischer had failed to assert any connection between

the "failings" listed in the malpractice count of his complaint and the alleged "damages." *Id.* at 380, 637 A.2d 517. Further, Fischer's argument in connection with the pre-trial detention fared no better. We said, at 99 Md.App. at 380–81, 637 A.2d 517:

[Fischer] alleges that appellees failed to take any measures to seek [his] release on bond and that, as a result, he remained incarcerated for approximately ten months "when [Fischer] was eligible for bond if defendants had only requested it." That is all the complaint says. There is no allegation in [the malpractice count] that [Fischer] specifically directed [the] appellees to seek his release on bond or that, at any time during their representation of him, he would have been able to post bond. During the hearing on the motion, [Fischer's] attorney revealed that (1) appellant remained in pre-trial detention until June, 1988—six months after new counsel had entered their appearance; (2) in August, 1987, prior to [the] appellees' employment, there had been a bond hearing before a U.S. Magistrate, that the pretrial release agency at that time had recommended appellant's release on a $150,000 bond, but that appellant was not released; and (3) he could not prove through the testimony of any Federal judicial officer that appellant would, in fact, have been released prior to June, 1988.

We do not regard the averments regarding pre-trial detention as sufficient, especially in light of these admissions. The fact that a defendant may be "eligible for bond" does not imply that he would have been released on bond had a request been made, and, indeed, the information supplied to the court in argument suggests that he likely would not have been so released at that time.

Not since *Fischer* has a reported opinion of this Court or the Court of Appeals addressed a criminal malpractice claim. Because of the lack of guidance in Maryland jurisprudence, the circuit court relied heavily on *Garcia v. Ray*, 556 S.W.2d 870 (Tex.Civ.App.1977, writ dism'd), an early criminal malpractice decision.

In that case, Alfredo Garcia was convicted of felony possession of a firearm and sentenced to life imprisonment as a habitual criminal. Although Garcia compensated his trial lawyer, Bennie Ray, for his services, he was evidently unable to afford counsel for an appeal. Consequently, the state appointed Ray, who prosecuted the appeal. Nevertheless, Garcia filed his own brief alleging, among other things, ineffective assistance of trial counsel. The Texas Court of Criminal Appeals concluded that Ray did not breach a legal duty to Garcia. *Id.* at 871. Garcia subsequently initiated a criminal malpractice action against Ray. In opposition to Ray's motion for summary judgment, Garcia filed an affidavit "complaining that Ray failed to call certain material witnesses during the course of the trial of the criminal case." *Id.* After Ray's motion was granted, Garcia appealed and argued "inferentially" that he had ineffective assistance of counsel. In addressing this issue, the court stated:

At no time does [Garcia] state that he was innocent. The appeal in the criminal case was to the highest Texas court in such matters. It tested the adequacy of counsel by the direct infusion of the point by the appellant himself in his pro se brief. The Court of Criminal Appeals held that there was no merit to this contention. Although we are not unmindful of the general rule that a judgment in a criminal prosecution is not a bar to a subsequent civil action arising from the same transaction, we do not believe that there could be an opposite result maintained in a civil court where such action was based on the same adjudicated question. The standard of proof generally in a criminal case is usually different than in civil actions. However, on the other hand, *how could you test the adequacy of counsel any better than by having the direct point determined by the highest court of our State in the related criminal case?*

*Id.* at 872 (emphasis added) (citation omitted).

Here, the trial court expressly "adopt[ed] the reasoning of the *Garcia* court," stating:

The Plaintiff in the case *sub judice* argued the issue of ineffective assistance of trial counsel before the Court of

Special Appeals without success. That ruling should bar him from attempting to obtain the opposite result in his civil case. The same rhetorical question asked by the *Garcia* court can and should be posed to the Plaintiff in this case: "How could you test the adequacy of counsel any better than by having the direct point determined by the highest court of our State in the related criminal case?"

(Citation omitted).

 Public policy considerations prompt us to align ourselves with those jurisdictions that have imposed appellate, post conviction, or habeas relief, dependent upon attorney error, as a predicate to *recovery* in a criminal malpractice action, when the claim is based on an alleged deficiency for which appellate, post conviction, or habeas relief would be available. A criminal conviction evidences that a fact-finder concluded, beyond a reasonable doubt, that the defendant committed the crime charged. Ordinarily, when the alleged negligence of defense counsel contributed to a conviction, the proper redress for the ineffective assistance of counsel is pursuit of one of the aforementioned forms of post trial relief; a criminal defendant may prevail in having the judgment of conviction vacated in a post conviction, appellate, or habeas proceeding, for any number of reasons. If a potential criminal plaintiff is unsuccessful in obtaining relief from conviction, then it would seem that the attorneys' conduct was not the proximate cause of the conviction or injury.

 Nevertheless, we conclude that a criminal plaintiff need not *obtain* post conviction relief *prior* to the *initiation* of a criminal malpractice action, so long as the criminal plaintiff has initiated a post conviction action. Moreover, in our view, the question of a criminal plaintiff's innocence is subsumed within the inquiry of whether the defense lawyer's conduct was the proximate cause of the conviction or the failure to secure dismissal of charges.

That a criminal plaintiff is obligated to pursue post conviction relief as an element of a criminal malpractice case does not conclude our analysis. The question remains as to wheth-

er the adoption of that policy can be reconciled with the statute of limitations applicable to a malpractice case. We are satisfied that the legislatively mandated statute of limitations that governs malpractice cases can be reconciled with the requirement that a criminal plaintiff must obtain post conviction relief as a predicate to recovery in a criminal malpractice action.

As we observed, the *Shaw* court held that post conviction relief is a predicate to a criminal malpractice case, but concluded that the statute of limitations for a criminal malpractice case does not commence until after post conviction relief is awarded. *Shaw I*, 816 P.2d at 1360. *Gebhardt v. O'Rourke*, 444 Mich. 535, 510 N.W.2d 900 (1994), which reaches a different conclusion, is also instructive.

In *Gebhardt*, the court concluded that a criminal plaintiff's malpractice action was barred by the applicable statutes of limitation. *Id.* at 904. The statutes required a plaintiff to bring a malpractice action within two years of the last day of the attorney's representation, irrespective of the plaintiff's knowledge or discovery of the claim. *Id.* at 902–03. Alternatively, a six-month limitation period applied from the date a plaintiff discovered, or should have discovered, a claim of malpractice. *Id.; see* Mich. Comp. Laws Ann. §§ 600.5805, 600.5838 (West 2000). Consequently, the Michigan court held that the two-year period barred the criminal malpractice claim, because the attorney's last day of service was February 3, 1987, and the criminal malpractice claim was not initiated until November 3, 1989. *Gebhardt*, 510 N.W.2d at 902–04. Moreover, the court determined that the six-month discovery rule also barred the action. *Id.* at 904. Rejecting the intermediate appellate court's holding that the cause of action did not accrue until the trial court entered judgment of acquittal in connection with the criminal plaintiff's motion for new trial, *see id.* at 902, the Michigan Supreme Court declared that the plaintiff knew she had a claim against her former defense counsel at the time she moved for a new trial in March 1987. *Id.* at 901, 904.

In arriving at these conclusions, the Michigan court was confronted with the criminal plaintiff's argument concerning the requirement of post conviction relief as a predicate for a criminal malpractice claim. *Id.* at 905. The *Gebhardt* court voiced its concern of "a subversion of the statute of limitations by allowing a criminal defendant to first obtain postconviction relief before starting the clock on the limitation period." *Id.* at 907. Rather than tolling the limitations period, the *Gebhardt* court embraced a "two track" approach, pursuant to which a plaintiff must pursue a criminal malpractice claim concurrent to post conviction proceedings, or risk the time bar imposed by statute. *Id.* It reasoned that the " 'two track' approach provides the best balance between the competing concerns of fairness to criminal defendants and allowing the attorney a fair opportunity to defend." *Id.* Further, the court said, *id.*, that once the criminal plaintiff's claim is preserved,

he can and should seek a stay in the civil suit until the criminal case is resolved. The trial court handling the civil suit would have discretion regarding whether the stay would continue until judgment in the criminal matter is final or, if after the initial judgment on postconviction relief, justice would permit going forward with the civil suit while the appeal process in the criminal matter continues until final determination.

Several courts, such as the Nebraska Supreme Court and the New Mexico Court of Appeals, have found *Gebhardt*, 510 N.W.2d 900, persuasive and have adopted its two track approach. Conversely, several jurisdictions have followed the lead of the Alaska Supreme Court in *Shaw I*, 816 P.2d at 1360, in holding that the applicable limitations period is tolled until the adjudication of the prospective criminal plaintiff's posttrial claim for relief from the criminal conviction. *See, e.g., Steele*, 747 So.2d at 933; *Adkins*, 482 S.E.2d at 801.

*Seevers v. Potter*, 248 Neb. 621, 537 N.W.2d 505 (1995), also provides guidance. There, David Seevers retained Paul Potter to represent him in connection with criminal drug and violation of probation charges. Potter subsequently advised Seevers that he could not sustain a viable defense and sug-

gested that Seevers pursue a plea bargain. Accordingly, on advice of counsel, Seevers pled no contest to the charges against him, in exchange for the state's agreement not to pursue additional charges. Thereafter, Seevers was sen- tenced to seven to fifteen years. Seevers subsequently claimed that Potter advised him that if he accepted the plea agreement, he would only be sentenced to a total of three to six years of incarceration. Moreover, Seevers claimed that he asked Potter to prepare an appeal of the sentences, Potter agreed, but no appeal was filed.

While incarcerated, Seevers, through new counsel, success-fully vacated his sentences "on the grounds that Potter's actions violated Seevers' constitutional rights." *Id.* at 508. Seevers was then resentenced. Thereafter, Seevers initiated a criminal malpractice action against Potter, alleging that Potter had failed to advise him properly of the ramifications of the plea agreement, and had failed to appeal the original sentences. The trial court dismissed the case after determin-ing that suit was barred by limitations.[14] In analyzing the case on appeal, the Nebraska Supreme Court noted:

[N]either the trial court nor this court was asked to address whether Seevers may maintain an action for legal malprac-tice under the facts set forth in his petition, since he obtained only a reduction in sentence rather than an acquit-

---

14. Neb.Rev.Stat. § 25–222 (1995) states:

Any action to recover damages based on alleged professional negli-gence or upon alleged breach of warranty in rendering or failure to render professional services shall be commenced within two years next after the alleged act or omission in rendering or failure to render professional services providing the basis for such action; *Provided,* if the cause of action is not discovered and could not be reasonably discovered within such two-year period, then the action may be commenced within one year from the date of such discovery or from the date of discovery of facts which would reasonably lead to such discovery, whichever is earlier; *and provided further,* that in no event may any action be commenced to recover damages for professional negligence or breach of warranty in rendering or failure to render professional services more than ten years after the date of rendering or failure to render such professional service which provides the basis for the cause of action.

tal. Rather, we are asked to determine only whether Seevers' imprisonment tolled the statute of limitations. An appellate court will not consider on appeal an issue that was not presented to or passed upon by the trial court. Thus, for the purposes of this opinion, we assume, without deciding, that Seevers had pled a viable cause of action.

*Id.* (citation omitted).

Turning to the merits, Seevers argued that the limitations period should be tolled as set forth in *Shaw I. Seevers,* 537 N.W.2d at 509. The court described the essence of Seevers's argument as follows: "Seevers intrinsically argues that in cases involving legal malpractice claims involving criminal defense attorneys, it is not reasonably possible for the client to discover his or her cause of action for professional negligence until the client successfully petitions for postconviction relief." *Id.* at 509.

In discussing the contrary conclusion in *Gebhardt,* as well as the Michigan Supreme Court's rejection of the *Shaw I* approach, the *Seevers* court said:

The *Gebhardt* court recognized that the policy arguments set forth in the *Shaw* [*I* ] decision addressed some substantial concerns with regard to the conflict between simultaneous criminal postconviction actions and civil malpractice actions involving the same issues. However, the *Gebhardt* court analyzed the situation in a manner that provided a strict reading of the statute of limitations while addressing the problems posed by multiple litigations. . . .

*Seevers,* 537 N.W.2d at 510. The *Seevers* court quoted heavily from *Gebhardt,* adopting its two track approach, and stated further that "the Nebraska Legislature, in adopting § 25–222, opted for the occurrence rule, tempered or ameliorated by a provision for discovery." *Id.* at 511. Referring to the plain meaning of the statute, the *Seevers* court held that Seevers's action was barred by the statute of limitations, because he "could reasonably have discovered that he had a potential cause of action for legal malpractice against Potter prior to September 8, 1992—the date exactly 1 year prior to the date

upon which Seevers filed his original petition in the instant action." *Id.*

*Duncan v. Campbell,* 123 N.M. 181, 936 P.2d 863 (App.), *cert. denied,* 123 N.M. 168, 936 P.2d 337 (1997), also involved a trial court's dismissal of an action alleging criminal malpractice. In that case, Donald Duncan retained a number of lawyers, including Arnold Miller (collectively, "Miller"), to represent him in defense of sexual offense charges. Duncan was ultimately tried, convicted, and sentenced to twenty-five years of imprisonment. According to the *Duncan* court's recitation of facts, at the time of his conviction, Duncan "knew that [Miller] did not represent him to his satisfaction and, in particular, that there were alibi witnesses that were neither investigated nor presented." *Id.* at 864. In an unreported opinion, the New Mexico intermediate appellate court affirmed the conviction, rejecting Duncan's allegations of ineffective assistance of counsel. Thereafter, Duncan initiated a successful habeas corpus proceeding in state court, which was affirmed by the New Mexico Supreme Court. Although Duncan was awarded a new trial, the state chose not to retry him and he was released from prison. Duncan subsequently filed an action against Miller that included allegations of criminal malpractice and breach of implied contract.

As in *Gebhardt* and *Seevers,* the *Duncan* court's analysis rested on limitations. *Id.* at 864. Chapter 37 of the New Mexico statutes governs limitations and begins with the general statement in N.M. Stat. Ann. § 37–1–1 (Michie 1990), that "[t]he following suits or actions may be brought within the time hereinafter limited, respectively, after their causes accrue, and not afterwards, except when otherwise specially provided." Section 37–1–4 stated that actions "founded upon accounts and unwritten contracts" must be brought "within four years." Under N.M. Stat. Ann. § 37–1–8, actions "for an injury to the person or reputation of any person" must be brought "within three years." Additionally, the court noted that "New Mexico follows a discovery rule in legal malpractice cases in which the statute of limitations does not begin to run

until the client discovers a loss caused by the attorney's wrongful act or omission." *Duncan,* 936 P.2d at 865.

Duncan and Miller disputed whether the three- or four-year limit applied. Nevertheless, the *Duncan* court found it unnecessary to determine which of the two applied "because, as Duncan asserts in his complaint, he 'knew from the time of the trial of the criminal case that Miller ... had not adequately and properly represented him.'" *Duncan,* 936 P.2d at 865. The court "interpret[ed] this contention in the complaint to mean that [Duncan] knew enough at that time to allow accrual of the action and running of the statute of limitations." *Id.*

The court then considered whether post conviction relief is a predicate to recovery in a criminal malpractice action. The *Duncan* court reviewed *Shaw I* but, as did the *Seevers* court, rejected the Alaska Supreme Court's approach in favor of *Gebhardt. See id.* at 865–68. The *Duncan* court reasoned:

[E]ven if we were moved by [Duncan's public policy] concerns ... we do not believe that the appropriate response to those concerns would be to potentially indefinitely toll the statute of limitations. It must be remembered that criminal defendants have no time limits on habeas corpus relief in New Mexico. In fact, [Duncan] waited more than two years after his conviction was affirmed to file his habeas petition. In this connection, we agree with the Michigan court that the legislative policies underlying statutes of limitations, which courts are bound to uphold, suggest that neither the statutes of limitations nor the elements of the tort of malpractice should be altered to satisfy other policy concerns. Rather, [Duncan's] concerns may be accommodated by recognizing that there may be two tracks, one civil and one criminal, arising out of malpractice committed in criminal cases. In appropriate cases, the civil track may be stayed while the criminal track is pursued. The utilization of this "two track" approach was viewed as providing the best balance between the competing concerns of fairness to the criminal defendant and allowing the attorney a fair opportunity to defend.

\* \* \*

... With the claim preserved, the plaintiff may and perhaps should seek a stay in the civil suit until the criminal case is resolved. The trial court handling the civil suit would have discretion regarding imposition of a stay, keeping in mind the nature of the basis asserted for post-conviction relief.

*Id.* at 868–69 (citations omitted). Accordingly, the court affirmed the dismissal of the criminal malpractice and breach of contract claims. *Id.* at 869.

The caution expressed by the *Gebhardt, Seevers,* and *Duncan* courts is well-founded. Concurring in *Wiley,* 79 Cal. Rptr.2d 672, 966 P.2d 983, a decision requiring "actual innocence" in a criminal malpractice suit, Associate Justice Kathryn M. Werdegar of the California Supreme Court observed:

One problem with announcing a new, policy-based rule is that unintended consequences invariably follow. So it is here. Our court has in recent cases made it abundantly clear that we will strictly follow the statute that governs the accrual and limitation of claims for attorney malpractice. Under [Cal. Civ.Code § 340.6], an action against an attorney for a wrongful act or omission must ordinarily be commenced within one year after the plaintiff discovers, or should have discovered, the facts constituting the wrongful act or omission. In view of the time required to decide appeals and petitions for habeas corpus in criminal cases, the statute of limitations in most cases likely will run long before the convicted person has a chance to have the conviction set aside and, thus, remove the bar (collateral estoppel) to establishing his or her actual innocence. The majority alludes to this problem, but offers no solution. Indeed, I see no ready solution, considering that we have soundly condemned all nonstatutory tolling rules, including our own prior effort to redefine the element of "damages" so as to prevent the accrual of a cause of action for malpractice until all related lawsuits that might undo the harm caused by the malpractice have concluded.

*Wiley,* 79 Cal.Rptr.2d 672, 966 P.2d at 992 (Werdegar, J., concurring) (citations omitted).

█ Unlike in *Gebhardt, Seevers,* and *Wiley,* however, the Maryland General Assembly has not enacted specific legislation as to the limitations period relevant to a legal malpractice case. *But see, e.g.,* Md.Code (1974, 1998 Repl.Vol.), § 5–109 of the Courts & Judicial Proceedings Article ("C.J.") (governing limitations for actions against health care providers). In Maryland, legal malpractice claims are generally controlled by C.J. § 5–101, which requires that a civil action "be filed within three years from the date it accrues." *See Fairfax Sav., F.S.B. v. Weinberg & Green,* 112 Md.App. 587, 612, 685 A.2d 1189 (1996). "This section reflects the General Assembly's judgment of what constitutes an adequate time for a person of ordinary diligence to bring an action and is intended to promote fairness and judicial economy." *Frederick Road Ltd. Partnership v. Brown & Sturm,* 360 Md. 76, 94, 756 A.2d 963 (2000). As the Court of Appeals explained in *Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 464 A.2d 1020 (1983):

The adoption of statutes of limitation reflects a policy decision regarding what constitutes an adequate period of time for a person of reasonable diligence to pursue a claim. Such statutes are designed to balance the competing interests of each of the potential parties as well as the societal interests involved. Thus, one of the purposes of such statutes is to assure fairness to a potential defendant by providing a certain degree of repose. This is accomplished by encouraging promptness in prosecuting actions; suppressing stale or fraudulent claims; avoiding inconvenience that may stem from delay, such as loss of evidence, fading of memories, and disappearance of witnesses; and providing the ability to plan for the future without the uncertainty inherent in potential liability. Another basic purpose is to prevent unfairness to potential plaintiffs exercising reasonable diligence in pursuing a claim. Still another purpose is to promote judicial economy.

*Id.* at 665, 464 A.2d 1020; *accord Frederick Road,* 360 Md. at 94–95, 756 A.2d 963; *see Pennwalt Corp. v. Nasios,* 314 Md.

433, 437–38, 550 A.2d 1155 (1988); *Edmonds v. Cytology Servs. of Md., Inc.,* 111 Md.App. 233, 244, 681 A.2d 546 (1996), *aff'd sub nom. Rivera v. Edmonds,* 347 Md. 208, 699 A.2d 1194 (1997).

Ordinarily, the question of when a claim "accrues" for purposes of C.J. § 5–101 is left to judicial determination. *See Frederick Road,* 360 Md. at 93–94, 756 A.2d 963; *United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 579, 650 A.2d 226 (1994). An action is said "to 'accrue' on the date of the wrong." *Murphy v. Merzbacher,* 346 Md. 525, 532, 697 A.2d 861 (1997). But, in cases "when stealth, subterfuge, or other difficulties of detection leave a plaintiff 'blamelessly ignorant' of the facts and circumstances legally entitling him or her to relief," the so-called discovery rule applies. *Murphy,* 346 Md. at 532, 697 A.2d 861 (quoting *Doe v. Maskell,* 342 Md. 684, 690, 679 A.2d 1087 (1996), *cert. denied,* 519 U.S. 1093, 117 S.Ct. 770, 136 L.Ed.2d 716 (1997)). The discovery rule provides that the statute of limitations does "not begin to run against the plaintiff, unless he or she knows, or through the exercise of reasonable diligence should know, of the wrong." *Id.; see Edwards v. Demedis,* 118 Md.App. 541, 553, 703 A.2d 240 (1997), *cert. denied,* 349 Md. 234, 707 A.2d 1328 (1998); *cf.* C.J. § 5–203 ("If the knowledge of a cause of action is kept from a party by the fraud of an adverse party, the cause of action shall be deemed to accrue at the time when the party discovered, or by the exercise of ordinary diligence should have discovered the fraud."). In other words, the limitations period is tolled until a plaintiff has notice of the nature and cause of injury. *Frederick Road,* 360 Md. at 98, 756 A.2d 963.

It is well settled that the discovery rule applies to professional malpractice cases. *See, e.g., Frederick Road,* 360 Md. at 96, 756 A.2d 963; *Goldstein v. Potomac Elec. Power Co.,* 285 Md. 673, 685, 404 A.2d 1064 (1979); *Edwards,* 118 Md.App. at 553, 703 A.2d 240; *Fairfax Sav.,* 112 Md.App. at 612–13, 685 A.2d 1189. Additionally, our courts recognize a "corollary accrual doctrine," referred to as the continuation of events theory. *Frederick Road,* 360 Md. at 97, 756 A.2d 963.

Discussing the theory in *Hecht v. Resolution Trust Corp.*, 333 Md. 324, 635 A.2d 394 (1994), the Court said:

The "continuation of events" theory was first recognized by this Court in *W., B. & A. Elec. R.R. Co. v. Moss*, 130 Md. 198, 100 A. 86 (1917), involving compensation for services extended over a period of time. We said that "in cases where there is an undertaking which requires a continuation of services, or the party's right depends upon the happening of an event in the future, the statute begins to run only from the time the services can be completed or from the time the event happens." *Id.* at 204–05, 100 A. 86. *Vincent v. Palmer*, 179 Md. 365, 19 A.2d 183 (1941), involved an employee who sued his employer on an agreement to share profits. We said that "[w]here a contract does not mention the period of employment, and the claim of the employee is based upon 'continuous employment,' indicating one entire contract, even though the work may be interrupted from time to time, the statute will not run until the completion of the contract." *Id.* at 374, 19 A.2d 183. *Waldman [ v. Rohrbaugh*, 241 Md. 137, 215 A.2d 825 (1966) ], involved a continuous course of treatment by a physician. We there noted that "if the facts show continuing medical or surgical treatment for a particular illness or condition in the course of which there is malpractice producing or aggravating harm, the cause of action of the patient accrues at the end of the treatment for that particular illness, injury or condition, unless the patient sooner knew or reasonably should have known of the injury or harm. . . ." *[Id.]* at 142, 215 A.2d 825. This continuous course of treatment rule is applied because of the confidential relationship between the physician and the patient. Because of this relationship of trust and reliance, the patient is excused from making inquiry questioning the physician's care.

*Id.* at 337–38, 635 A.2d 394; *see Vigilant Ins. Co. v. Luppino*, 352 Md. 481, 490, 723 A.2d 14 (1999).

As the foregoing suggests, the continuation of events theory is premised on the notion "that a relationship which is built on trust and confidence generally gives the confiding

party the right to relax his or her guard and rely on the good faith of the other party so long as the relationship continues to exist." *Frederick Road*, 360 Md. at 97–98, 756 A.2d 963. Consequently, the confiding party is not under a "duty to make inquiries about the quality or bona fides of the services received, unless and until something occurs to make him or her suspicious." *Id.*

We are persuaded by the Pennsylvania Supreme Court's decision in *Bailey v. Tucker*, 533 Pa. 237, 621 A.2d 108. *Bailey* involved two consolidated appeals in which the plaintiffs' criminal malpractice claims were found time barred by the lower courts. In considering the preclusive effect of the applicable statute of limitations, the *Bailey* court observed that the issue of whether the claim was barred by limitations was "overshadowed by . . . the viability" of a criminal malpractice action. *Id.* at 110. Relying principally on public policy grounds, the court held that the following elements comprise a criminal malpractice action in Pennsylvania:

(1) The employment of the attorney;

(2) Reckless or wanton disregard of the defendant's interest on the part of the attorney;

(3) the attorney's culpable conduct was the proximate cause of an injury suffered by the defendant/plaintiff, i.e., "but for" the attorney's conduct, the defendant/plaintiff would have obtained an acquittal or a complete dismissal of the charges.

(4) As a result of the injury, the criminal defendant/plaintiff suffered damages.

(5) *Moreover, a plaintiff will not prevail in an action in criminal malpractice unless and until he has pursued post-trial remedies and obtained relief which was dependent upon attorney error;* additionally, although such finding may be introduced into evidence in the subsequent action it shall not be dispositive of the establishment of culpable conduct in the malpractice action.

*Id.* at 115 (emphasis added) (footnotes omitted). A footnote at the close of the phrase emphasized above said:

> *This requirement does not, however, relieve the plaintiff of his duty to initiate this cause of action within the statute of limitations period* as hereinafter discussed, but it does raise a procedural question, to wit: what is to be done with a civil action filed prior to the completion of the post-conviction process? The answer is that an attorney defendant who is served with a complaint alleging professional malpractice for the handling of a criminal matter may interpose a preliminary objection on the grounds of demurrer. *The trial court shall then reserve its ruling on said objection until the resolution of the post-conviction criminal proceedings.*

*Id.* n. 13 (emphasis added) (citation omitted).

The *Bailey* court subsequently discussed the statute of limitations, stating:

> With regard to the respective statutes of limitations, the rule in this Commonwealth is that the statutory period commences at the time the harm is suffered or, if appropriate, at the time the alleged malpractice is discovered. In the context of a criminal malpractice action, the time when the harm is suffered will, in the typical case, be easily identifiable, i.e., the date of sentencing. However, since criminal sanctions are by their nature directed to the criminal defendant's actions, and thus those actions are presumed to be the legal cause of the harm suffered, the date a defendant becomes aware that his counsel may have been responsible for the harm will likely be harder to pinpoint. Nonetheless, it is necessary to establish a point from which the statute of limitations period will commence. The appropriate starting point is the termination of the attorney-client relationship, since at that point the aggrieved defendant is aware of the injury (i.e., the conviction), and is on clear notice to investigate any alternate cause of that harm which he believes to exist. In this regard the defendant is not

unlike the medical patient who becomes aware of an injury and is then placed on notice to discover its cause.

*Id.* at 115–16 (footnotes omitted).

 As *Bailey* makes clear, a so-called "two track" approach can be applied under the circumstances attendant here. Therefore, notwithstanding that the criminal plaintiff must obtain post conviction relief as a predicate to recovery in a criminal malpractice case, we conclude that a criminal plaintiff must also comply with the limitations period of C.J. § 5–101, as tempered by the discovery rule and continuation of events theory. Because a criminal plaintiff must timely file a criminal malpractice action, we recognize that a criminal plaintiff may have to initiate the malpractice suit prior to resolution of all post conviction proceedings, in order to satisfy limitations. In that circumstance, upon motion of either party, the trial court in the criminal malpractice action should not dismiss the malpractice case merely because the criminal plaintiff has not obtained post conviction relief. Rather, the court should stay the malpractice suit pending the criminal plaintiff's diligent effort to obtain resolution of the requisite post conviction, appellate, or habeas proceedings.

Our reasoning is undoubtedly obvious. The criminal plaintiff has little control over how long it may take for the post conviction court to resolve the post conviction case. If the court in the malpractice case were to dismiss the malpractice action prior to resolution of the post conviction case, merely because the criminal plaintiff had not yet obtained post conviction relief, then the criminal plaintiff could be placed in an untenable position, in which the statute of limitations could expire before resolution of the post conviction matter. Moreover, the criminal plaintiff cannot initiate a federal habeas action until "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A) (1994 & Supp. III 1997). In this case, the Court of Appeals denied certiorari while the criminal malpractice action was pending. Only then could appellant file for federal habeas

relief. Appellant should have been afforded a reasonable opportunity to pursue his federal habeas claim.

■■■ In sum, a criminal malpractice action must be timely filed and requires: (1) the prior employment of the lawyer; (2) the lawyer's neglect of a reasonable duty; (3) loss to the client proximately caused by that neglect of duty; (4) the criminal plaintiff's initiation of post conviction, appellate, or habeas relief premised on the lawyer's error; (5) and, ultimately, the criminal plaintiff's successful pursuit of post conviction, appellate, or habeas relief based on attorney error.

Although our conclusions of law are similar to those of the circuit court, application of our statement of the law to the facts of the case *sub judice* requires a different result. In our view, summary judgment as to appellant's allegations of attorney negligence was premature. As noted above, while the malpractice case was pending, the Court of Appeals denied certiorari in appellant's post conviction case. Appellant then advised the court of his intent to file a habeas petition. Therefore, the circuit court should have considered a stay of the criminal malpractice action in order to permit appellant to pursue promptly and diligently a petition for habeas corpus. Accordingly, on this particular issue, pursuant to Md. Rule 8–604(d), we shall neither affirm nor reverse the award of summary judgment. Rather, we shall remand the case to the circuit court for further proceedings pending resolution of the federal habeas case.

## II.

Appellant contends that the court misinterpreted paragraph 46(c) of his complaint in finding that he knew appellees did not intend to note an appeal of his criminal conviction.

In the complaint, paragraph 46(c) is found under a heading labeled "Defendants' Pre–Hearing Representation of Berringer." It states:

46. On January 31, 1995, the morning of the very hearing for which [appellees] had been engaged, Steele visited Berringer in the inmate lock-up area of the Baltimore

County Circuit Court, and at that time, Steele advised Berringer that Steele:

* * *

(c) **had decided not to file for an appeal "after today's hearing"** *because he was out of money* [.]

Citing the allegation, the court recorded the following undisputed material fact in its April 1999 memorandum and ruling: "The Plaintiff was aware that the Defendants 'had decided not to file for an appeal "after today's hearing" "because he was out of money[.]" ' "

Before addressing this issue, we find it helpful to chronicle other allegations made by appellant. Paragraph 40, included in the same heading, indicated that, on January 26, 1995, Steele met with Berringer and informed him that neither Lyons nor Gentile had filed a notice of appeal. Gentile had not done so "because he felt it was a waste of time." Paragraph 61, set forth under the heading of "The Hearing," contained the following:

> After the January 31, 1995 new trial and dispensation hearing, both Steele and Gentile failed to request a copy of the criminal Trial Transcript or a copy of the January 31, 1995 new trial and dispensation hearing and *they refused to file for an appeal even though they had ample evidence and many reasons to file for an appeal.*

(Emphasis added).

Appellees made offensive use of paragraphs 40 and 61 in their reply to appellant's opposition to appellees' motion for summary judgment. The paragraphs were invoked in order to refute Berringer's contention that a written agreement is subject to subsequent oral modification by the contracting parties. In his Surreply of October 26, 1998, Berringer explained as to paragraph 40:

> [G]iven the numerous assurances of Defendants that they would file the Notice of Appeal, even up to January 26, 1995, the statement from Steele meant nothing more than that, given the tasks presently before them, i.e., the new trial and

sentencing hearings, Gentile had prioritized his time to relegate the filing of the notice of appeal toward the end of his list of things to do.

With respect to paragraph 60, the Surreply indicated that "the allegation only states that, in hindsight, Defendants in fact, did not file the Notice of Appeal after the January 31, 1995 hearing," and that the paragraph should not be read to establish that appellees continually informed appellant that they had not and would not note an appeal.

At the summary judgment hearing on October 26, 1998, appellees' counsel referred to paragraph 46(c), stating:

[I]t is alleged that as of January the 31st, 1995, which was the day that the motion for new trial was denied, and the day that the appeal time would have started to run, as a matter of law Mr. Berringer knew that neither Mr. Steele, Mr. Gentile, or [the Firm] were going to take an appeal.

I can conceive of no legal basis whatsoever that would warrant any finding of damages flowing from that, nor do I see that to be an act or omission in error arising out of an attorney client relationship.

They tell them they are not going to file an appeal. He has the thirty days, and he is advised.

Evidently persuaded, at least in part, by this argument, the court determined in its April 1999 memorandum that, notwithstanding an alleged factual dispute as to the scope of the parties' agreement concerning the filing of an appeal, "there is no dispute that the Plaintiff knew of the Defendants' decision not to note an appeal as early as January 26, 1995." Because appellant knew appellees would not note an appeal, the court concluded that appellant was contributorily negligent in not taking action to ensure that the appeal was filed, and also failed, as a matter of law, to mitigate his contract damages.

On appeal, Berringer maintains that the court's finding and corresponding legal conclusion were premised on an erroneous assumption that paragraph 46(c) constituted the "last word" on the issue of appellees' duty to note an appeal on Berringer's behalf. Appellant avers that paragraph 46(c) was includ-

ed in the complaint to demonstrate appellees' failure to follow appellant's instructions, despite "repeated assurances to the contrary." More broadly, appellant suggests that all of the allegations contained under the heading "Defendants' Pre-Hearing Representation of Berringer" were used to show what was requested of appellees and what they actually did or did not do, as well as to demonstrate appellees' unpreparedness for the motion and sentencing hearing.

In support of these contentions, appellant refers us to two affidavits he filed below in an effort to clarify the assertions in his complaint. The first was filed in conjunction with appellant's opposition to appellees' motion for summary judgment and stated, in pertinent part:

> The Defendants did not, at any time after the hearing on the Motion for New Trial on January 31, 1995, advise me of when the time expired for filing the Notice of Appeal of my conviction. I had no counsel other than Defendants at that time, and fully expected that Defendants would file the Notice of Appeal on my behalf pursuant to our engagement agreement.

The second affidavit was filed in support of Berringer's motion to alter or amend the summary judgment ruling. There, appellant alleged:

> From the very beginning of my engagement of [appellees] it was clear between them and me that one of the things I wanted them to do was to file the Notice of Appeal to preserve my appeal rights. At that time I did not know about the technical issues or the requirements relating to an appeal, but only that the Notice of Appeal had to be filed to preserve my appeal rights which, given the results of the criminal trial and what happened at the trial, I certainly intended to do, whether with the Defendants or some other counsel engaged for that purpose. The Defendants repeatedly assured me that they were going to file the Notice of Appeal on my behalf, including before and on and after January 31, 1995. The quoted phrase "after today's hearing" in Paragraph 46 of the Complaint referred to an earlier

promise Steele had made to file the Notice of Appeal on the day of the hearing after the hearing. As I understood it from the Defendants, their delays in filing the Notice of Appeal was because of the work, effort and time they were expending in preparing for my hearing on January 31, 1995 for the motion for new trial and sentencing, and that filing the Notice of Appeal was one or two pieces of paper and took little time to prepare.

... More specifically, at the meeting on January 31, 1995 between me and Steele, before the hearing, after Steele conveyed what is outlined in Paragraph 46 of the Complaint, I explained to Steele again that I was innocent.... I also confirmed to Steele as I had done on several other occasions that if more funds were needed for my defense my aunt, Ruth Walsh, had agreed to provide the necessary funds. After that brief discussion by me, Steele agreed that he would put on a good presentation for me at the hearing and would prepare and file the Notice of Appeal within a few days.

There is no general rule requiring a lawyer who undertakes a criminal defense to pursue an appeal. *See* 3 Mallen & Smith, *supra,* § 25.14, at 288. *But cf.* Md. Rule of Professional Conduct 1.3 cmt. ("[I]f a lawyer has handled a judicial or administrative proceeding that produced a result adverse to the client but has not been specifically instructed concerning pursuit of an appeal, the lawyer should advise the client of the possibility of appeal before relinquishing responsibility for the matter."). Moreover, before a lawyer can be held liable to his client, "it must appear that the loss for which [the lawyer] is sought to be held arose from [the lawyer's] failure or neglect to discharge some duty which was fairly within the purview of [the lawyer's] employment." *Watson v. Calvert Bldg. & Loan Ass'n,* 91 Md. 25, 33, 45 A. 879 (1900); *accord Stone v. Chicago Title Ins. Co.,* 330 Md. 329, 335, 624 A.2d 496 (1993); *Home Fed. Sav. & Loan Ass'n v. Spence,* 259 Md. 575, 585, 270 A.2d 820 (1970).

Although quoted earlier, we repeat relevant parts of the retainer agreement, for convenience:

We reserve the right to withdraw from representation for good cause such as your refusal to cooperate with our office or your failure to maintain an account in good standing. The firm will not discontinue legal services without giving you notice.

\* \* \*

Our undertaking is to represent you in regard to the reduction of bail, the motion for new trial, and the sentencing before Judge Howe. This agreement does not include an appeal of the conviction.

If you are in agreement with the above, would you please sign the copy enclosed herein and return it to me. A self-addressed envelope is enclosed for your convenience.

Relying on the retainer agreement, appellees maintain that appellant could not maintain a claim arising out of their alleged failure to note an appeal, because this "duty" was outside the scope of the retainer agreement. The trial court agreed, determining that the scope of appellees' employment was controlled by the retainer agreement. *See generally Stone*, 330 Md. at 341, 624 A.2d 496.

Appellant does not dispute that the unambiguous terms of the retainer agreement did not require appellees to note an appeal of appellant's criminal conviction. Nevertheless, appellant impliedly reinvokes the argument he expressly made in his opposition to appellees' motion for summary judgment. There, he averred that the parties orally modified the retainer agreement. At the hearing on appellees' motion for summary judgment, appellant's counsel asserted that appellant "has never contended that Mr. Steele was engaged to file briefs or conduct oral argument for appeal. Our only contention in the complaint and throughout this case, is that Steele and his firm's obligation was to file the notice of appeal...." Based on the parties' conduct subsequent to the execution of the retainer agreement, appellant claims the parties supplemented

or modified the retainer agreement, to include a duty to note the appeal on appellant's behalf. Thus, according to appellant, there are two contracts: the original, written retainer agreement and a subsequent, modified contract.

 "A written agreement ... may be *modified* by a subsequent oral agreement, but the oral modification must be established by a preponderance of the evidence." *Chesapeake Supply & Equip. Co. v. Manitowoc Eng'g Corp.*, 232 Md. 555, 566, 194 A.2d 624 (1963) (emphasis added); *accord Sullivan v. Mosner*, 266 Md. 479, 491, 295 A.2d 482 (1972). A "modification" amounts to the creation of a new contract. *Department of Pub. Safety & Correctional Servs. v. ARA Health Servs., Inc.*, 107 Md.App. 445, 458, 668 A.2d 960 (1995), *aff'd*, 344 Md. 85, 685 A.2d 435 (1996); *see Linz v. Schuck*, 106 Md. 220, 234, 67 A. 286 (1907) (stating that a modification is " 'an abandonment of the original contract and the creation of a new contract' " (citation omitted)); *see also L & L Corp. v. Ammendale Normal Inst.*, 248 Md. 380, 384, 236 A.2d 734 (1968) (acknowledging that a meeting of the minds is required to modify a contract); *McKeever v. Washington Heights Realty Corp.*, 183 Md. 216, 220, 37 A.2d 305 (1944) (same). Of significance here, the determination of whether the conduct of the parties subsequent to the execution of a written contract constitutes a modification is ordinarily a question left to the fact-finder. *University Nat'l Bank v. Wolfe*, 279 Md. 512, 523, 369 A.2d 570 (1977); *see Hoffman v. Glock*, 20 Md.App. 284, 289, 315 A.2d 551 (1974).

Appellant alleged in his complaint that appellees breached their "contract" with Berringer in failing, *inter alia*, to note an appeal of the criminal conviction. In the light most favorable to appellant, he sought recovery under the modified retainer agreement. But, the court found it unnecessary to determine whether the contract was modified, concluding that appellant's contributory negligence and failure to mitigate damages barred recovery.

At first glance, paragraphs 40, 46(c), and 60 of the complaint appear to be admissions of notice of appellees' intention not to

note an appeal on Berringer's behalf. But, appellant's first affidavit, filed in connection with his opposition to summary judgment, eviscerates that view. As highlighted above, appellant indicated that appellees did not advise him of the expiration period in which the notice of appeal should be filed. Moreover, Berringer stated that he "had no other counsel" and "fully expected" that appellees would note an appeal, "pursuant to [the] engagement agreement." Although the second affidavit was not before the court on motion for summary judgment, Berringer's statements in his first affidavit are akin to those he made in the second affidavit, in which he said more clearly that appellees "repeatedly assured [him] that they were going to file the Notice of Appeal on [his] behalf, including before and on and after January 31, 1995."

As noted, the determination of whether a contract has been "modified" is ordinarily a question for the finder of fact. *See University Nat'l Bank*, 279 Md. at 523, 369 A.2d 570. In this case, the parties disputed whether such a modification was made. Nevertheless, the court resolved this issue of disputed material fact when it determined, based on the terms of the original agreement, that Berringer "knew" that appellees did not intend to note an appeal. *See Berkey v. Delia*, 287 Md. 302, 332, 413 A.2d 170 (1980) (acknowledging that credibility of witnesses may not be weighed on motion for summary judgment); *Faith*, 127 Md.App. at 753, 736 A.2d 422 (stating that in resolving a summary judgment motion, the trial court may not determine the credibility of witnesses); *cf. Pittman v. Atlantic Realty Co.*, 359 Md. 513, 754 A.2d 1030 (2000) (rejecting the sham affidavit rule at summary judgment, which provides that a party may not defeat summary judgment by offering an affidavit that contradicts unambiguous testimony previously elicited during a deposition).

Although the court assumed "that a genuine dispute exist[ed] as to whether or not [appellees] had undertaken the responsibility of noting an appeal," it improperly made a factual finding in determining that it was undisputed that appellant knew appellees would not note an appeal. This

issue could be resolved only by assessing appellant's credibility. Yet, it is the fact-finder's duty to weigh the credibility of witnesses. Thus, the court erred in resolving the question of whether the parties modified their original contract so as to obligate appellees to note an appeal.

### III.

Appellant argues that the "most glaring defect" in the circuit court's opinion is its "*complete and utter failure* to address Berringer's allegations" concerning negligence and breach of contract with respect to sentencing. He avers that appellees' conduct leading up to and including the hearing on sentencing resulted in a harsher sentence than he would otherwise have been given. He further suggests in his brief:

Indeed, Berringer's sentence was destined to be more harsh given the fact that he steadfastly proclaimed his innocence at trial, but in the sentencing hearing, Defendant Steele, supposedly on behalf of Berringer,

 (i) admitted Berringer's guilt of the crimes for which Berringer was convicted;

 (ii) admitted and agreed that Berringer suffered from "too much salesmanship";

 (iii) admitted and agreed that Berringer suffered from delusions and did not have a hold on reality; and

 (iv) admitted and agreed that Berringer was likely to repeat the crime if he did not obtain professional help.

Appellees respond that appellant is now second-guessing the strategy employed at the sentencing hearing. That strategy was an "attempt to minimize the amount of jail time given to Appellant by Appellant accepting responsibility for his actions." Appellees further suggest that appellant's probation violation was a matter of his own doing and constituted an intervening and superseding force that relieved them of liability.

██ The circuit court's ruling of April 14, 1999, made no reference to any deficiency in appellees' representation as to sentencing. The court may have believed that appellant's allegations of negligence in connection with sentencing were subsumed within its discussion of the post conviction relief predicate to a criminal malpractice action. Although a criminal plaintiff's own actions, in the absence of post conviction relief, are viewed as the proximate cause of the conviction, *see supra* § I, the same does not hold true for the sentence. As two commentators recently acknowledged: "Clients have complained of an excessive or inappropriate ... sentencing. In that situation, guilt usually is not an issue." 3 Mallen & Smith, *supra,* § 25.14 (Supp.1999) (footnote omitted); *cf. Lawson v. Nugent,* 702 F.Supp. 91 (D.N.J.1988); *Geddie v. St. Paul Fire & Marine Ins. Co.,* 354 So.2d 718 (La.Ct.App.), *writ denied,* 356 So.2d 1011 (La.1978). *But cf. Howarth v. State,* 925 P.2d 1330 (Alaska 1996). The appropriateness of such a general rule is apparent in a situation such as this one, in which trial counsel differs from the attorney engaged for representation in connection with sentencing.

We turn to consider appellees' position that appellant's violation of probation "was an intervening and superseding cause of Appellant's lengthy incarceration, thereby precluding this claim." As discussed above, the circuit court imposed a fifteen-year sentence, with all but three years suspended, allowing credit for time served. *See* Art. 27, § 641A(a)(3) (authorizing the so-called "split sentence," empowering a court to "impose a sentence for a specified period and provide that a lesser period be served in confinement, suspend the remainder of the sentence and grant probation for a period longer than the sentence but not in excess of 5 years"). Less than ten months after sentencing, Berringer was found in violation of his probation. Consequently, the court rescinded probation and directed imposition of the previously suspended fifteen-year term. *Cf. Moats v. Scott,* 358 Md. 593, 596–97, 751 A.2d 462 (2000).

■ In our view, appellees erroneously suggested that Berringer's probation violation bars a negligence and breach of contract action in connection with appellees' representation at sentencing. Appellant complains that the negligent legal representation led to the imposition of the fifteen-year sentence; he does not challenge the representation that led to imposition of a previously suspended sentence because of the probation violation. Accordingly, we direct our attention to appellees' alternate contention that appellant's claim lacks merit because he is merely second-guessing counsel's sentencing strategy.

■ In his brief, appellant asserts that, but for appellees' negligent representation, he would have received a more favorable sentence. Appellees respond that "such a claim ... does not state a cause of action for legal malpractice, as strategic judgments cannot constitute a breach of duty." As we said in *Schlossberg v. Epstein*, 73 Md.App. 415, 435, 534 A.2d 1003 (1988), *cert. denied sub nom. State Farm v. Schlossberg*, 320 Md. 222, 577 A.2d 50 (1990), "hindsight, critical of an attorney's trial strategy, ordinarily is not sufficient to establish that the attorney has committed legal malpractice." But, we are not satisfied that the allegations here amounted to "Monday morning quarterback[ing]." *Wooddy v. Mudd*, 258 Md. 234, 251, 265 A.2d 458 (1970).

■ Appellant's complaint contained specific allegations from which it could be inferred, in the light most favorable to Berringer, that appellees presented positions to the court regarding sentencing of which appellant had not been previously advised and which were contrary to his instructions. *Cf. Fishow*, 55 Md.App. at 317–18, 462 A.2d 540 (acknowledging principle "that legal malpractice may give rise to an action for breach of contract in cases involving employment of an attorney to perform a specific service in accordance with clearly stated instructions from the client-employer," but concluding that the record in that case was "devoid of any showing that [the defendant lawyer] was instructed to adopt any particular theory in presenting [the plaintiff's] claim"). The complaint

does not indicate that appellant acquiesced to the arguments made at the hearing on January 31, 1995, or to the proposals in the sentencing memorandum. With respect to the breach of contract, it is readily apparent from the retainer agreement that appellees were hired to represent appellant in regard to sentencing. Accordingly, we conclude that summary judgment was not appropriate in connection with appellant's breach of contract and negligence [15] allegations concerning sentencing.

Our conclusion should not be construed to suggest that summary judgment is never appropriate in a legal malpractice case, or that it would not be appropriate here if the record were properly developed. But, appellees were the movants, and there was no evidence in this case offered by appellees as to the applicable standard of care. Indeed, no affidavits, deposition testimony, or other evidence was filed in support of summary judgment. As the Court of Appeals explained in *Franch v. Ankney*, 341 Md. 350, 670 A.2d 951 (1996), "[e]xpert testimony as to the relevant standard of care is necessary in an attorney malpractice case, except in those cases where the common knowledge or experience of laymen is sufficient to allow the fact finder to infer negligence from the facts." *Id.* at 357 n. 4, 670 A.2d 951; *see Central Cab Co. v. Clarke*, 259 Md. 542, 551, 270 A.2d 662 (1970). Appellees' representation of appellant in connection with sentencing is not, in our view, a situation in which the alleged incompetence or negligence of counsel was within the knowledge of a layperson. *See Fishow*, 55 Md.App. at 318–19, 462 A.2d 540. Without more, the record in this case was not sufficient to support the award of summary judgment on this issue.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY VACATED. CASE REMANDED TO**

---

15. As to negligence, in order to recover, the same elements of a legal malpractice action highlighted above must be proved. In other words, appellant must prove three things to recover: (1) the employment of appellees, (2) appellees' neglect of a reasonable duty as to sentencing, and (3) loss to appellant proximately caused by that neglect of duty. *See Wooddy*, 258 Md. at 237, 265 A.2d 458.

510

THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EQUALLY BETWEEN APPELLANT AND APPELLEES.